IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |  |
|---|---|---|
| THE RESERVE AT WINCHESTER I, LLC and ROBERT B. CATHCART, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3:21-cv-00008 |
| | ) ) | **MEMORANDUM OPINION** |
| v. | ) ) | By:   Hon. Thomas T. Cullen |
| R 150 SPE, LLC, | ) ) | United States District Judge |
| Defendant. | ) ) | |

On July 28, 2017, Plaintiff Robert B. Cathcart and Defendant R 150 SPE, LLC ("R 150") signed a real estate purchase option agreement ("the Option"). R 150 owns approximately 150 acres of undeveloped land in Frederick County, Virginia ("the Property"). The Option structured the parties' responsibilities and negotiations pertaining to Cathcart's potential future purchase of an approximately 26-acre, to-be-determined piece of that Property. If the parties could agree on that land's exact location—and honored their respective contractual obligations—R 150 would sell it to Cathcart, keeping the remainder for itself.

The deal eventually fell through, partly because R 150 failed to secure local-government permits that it had agreed to obtain. In an effort to realize benefit of his bargain, Cathcart— and the company he'd created to manage the purchased property, The Reserve at Winchester I, LLC ("Reserve")—sued R 150 for specific performance and filed a memorandum of *lis pendens* against the Property. R 150 counterclaimed for slander of title and moved to dismiss Plaintiffs' complaint.

At the first hearing on R 150's motion to dismiss, the court expressed doubts about Plaintiffs' specific performance claim. Shortly after the hearing, and while the motion to dismiss still was pending, Plaintiffs moved the court for leave to amend their amended complaint. The motion attached new exhibits and provided additional context to previously filed exhibits. R 150 opposed the motion.

These filings, and related motions, are before the court. For the reasons explained below, the court will grant Plaintiffs' motion for leave to amend their amended complaint (ECF No. 78), deny R 150's motion to dismiss (ECF No. 13), deny R 150's motion to quash Plaintiffs' memorandum of *lis pendens* (ECF No. 45), and deny R 150's motion for sanctions (ECF No. 32).

## I.   BACKGROUND

R 150 owns 150.35 acres of land in Frederick County, Virginia. (*See* ECF No. 80-2 at 2.)[1] That land is divided between three Tax Map Nos. Tax Map No. 64-A-10 is 29.657 acres, Tax Map No. 63-A-150 is 0.309 acres, and Tax Map No. 64-A-12 is 120.384 acres.[2] (*Id.*) Each Tax Map No. borders the other two. (ECF No. 80-4, at 3.)

On July 28, 2017, Cathcart and R 150 signed the Option, which outlined the conditions of a potential real-estate deal. (ECF No. 80-2, at 19.) Cathcart intended to build high-end residential apartment units on the land. (*Id.* at 1.) The details would be finalized in the coming

---

[1] The court will cite to Plaintiffs' proposed second amended complaint and its attachments because, for the reasons given in this memorandum opinion, the court will grant his motion for leave to amend *See infra* III.B. Accordingly, the proposed second amended complaint (ECF No. 80-1.) is the operative complaint.

[2] Plaintiffs' counsel has represented to the court that the acreages listed in the Option do not match the acreages listed in Frederick County's tax records. (Pls.' Resp. Opp'n Mot. Quash at 3 n.1 [ECF No. 55].) The court flags this purported discrepancy, which does not affect its analysis of the legal issues.

months, but the overarching structure was clear. Cathcart would pay R 150 monthly retainers of between $3,500 and $5,000. (*Id.* at 2–4.) In return, R 150 would not "materially and adversely affect title to any portion of the Property which is or may become subject to" a sale without Cathcart's written consent, along with other commitments. (*Id.* at 4.) For example, it would not "stockpile dirt or any other materials" on the Property without Cathcart's approval, and it would install the necessary water and sewer utilities. (*Id.* at 9, 12.)

After the parties fulfilled their mutual obligations under the Option, R 150 would sell "not more than 26.23 acres" of the Property to Cathcart. (*Id.* at 1.) The Option reserved a Study Period for Cathcart, during which he would evaluate the Property before notifying R 150 of his intention to close. (*Id.*) If Cathcart ended the Study Period by submitting a Notice of Exercise to Cathcart, the Option would become a contract for the sale of real property. (*Id.* at 1–5.) A Notice of Exercise is simply a written notice memorializing Cathcart's intent to purchase Parcel 1. (*See id.* at 5–6.)

Any sale would occur in two or three stages, whichever Cathcart chose. (*See id.* at 1–4.) Each of the three stages would concern a different piece of the conveyance: Parcel 1, Parcel 2, and Parcel 3. (*See id.*) The parties would not determine precise boundaries of each Parcel until the completion of each stage. (*See id.* at 1–4.) The sale price was indexed to the number of units Cathcart intended to build on each Parcel. (*Id.* at 5.)

In anticipation of taking title to the land, Cathcart created Reserve. (Pls.' Proposed Second Am. Coml. ¶ 26 [ECF No. 80-1].) He organized Reserve "as a special purpose entity to develop and operate the Property." (Pls. Resp. Opp'n Mot. Dismiss at 2 [ECF No. 15].) Cathcart represents to the court that these "organizational structures are customary in

commercial real estate transactions," and that he has executed an assignment of the Option to Reserve, which is being "held in escrow to be provided to R 150 in anticipation of closing." (*Id.* at 2 n.2.)

The Option also defines the remedies available to either party in the event of a breach. If Cathcart breached, R 150 would be entitled to keep the monthly retainers that Cathcart had paid. (ECF No. 80-2, at 14.) If R 150 breached, Cathcart could either terminate the agreement, or waive the breach and "proceed to purchase the applicable Parcel as provided" in the Option. (*Id.* at 13.) In the event of a "willful breach" by R 150, Cathcart could "sue for specific performance of [the] Agreement and the right to recover reasonable attorneys' fees" or terminate the agreement and collect from R 150 his "reasonable costs and expenses . . . expended or incurred . . . pursuant to [the] Agreement or in enforcement of [the] Agreement." (*Id.* at 13–14.)

Over the life of the project, the parties have amended the Option three times. (*See* ECF Nos. 80-5, 80-7, 80-14.) The First Amendment postponed the end of the Study Period, effectively giving R 150 additional time to provide engineering materials to Cathcart, which Cathcart would review before deciding whether to exercise his option. (*See* ECF No. 80-5, at 1–2.) The Second Amendment ended Cathcart's Study Period and set tentative dates for the closings on Parcel 1 and Parcel 2. (*See* ECF No. 80-7, at 2–3.) In effect, then, the Second Amendment functioned as a Notice of Exercise. It also eliminated any reference to Parcel 3. (*Id.* at 3.) The Third Amendment postponed the closing on Parcel 1, in part so that R 150 could "design, complete and obtain all necessary approvals for [a] 10-foot asphalt pedestrian and bicycle trail . . . account[ing] for the layout presently shown on Purchaser's site plans,

dated April 30, 2020 with a November 20, 2020 revision date." (ECF No. 80-14, at 2.) R 150 refused to sign a proposed Fourth Amendment, which would have further postponed the closing on Parcel 1. (*See* ECF No. 80-19, at 6–12.)

Instead, R 150 sent Cathcart a letter explaining that it had terminated the Option, effective immediately, because the parties had not met certain conditions precedent. (ECF No. 80-20.) One of these conditions was R 150's obligation to subdivide Parcel 1 from the remainder of the Property. (*See* ECF No. 80-2, at 8.) Although R 150 had previously circulated a draft subdivision plat and Cathcart had confirmed that plat's accuracy, R 150 had never filed the plat with Frederick County for approval. (*See* ECF No. 80-12, at 1, 53–56; ECF No. 80-13, at 2.) (Cathcart's confirmation was not attached to the amended complaint but is attached to the proposed second amended complaint. (ECF No. 80-13.)) R 150 returned the monthly retainers Cathcart had paid to-date, as required by the termination provision. (ECF No. 80-21; *see* ECF No. 80-2, at 9.)

Plaintiffs responded to this purported termination by filing the instant lawsuit in the Circuit Court of Albemarle County. Their complaint alleges that R 150 has willfully breached its contractual duties and argues that they are entitled to specific performance of the contract. (Pls.' Proposed Second Am. Compl. ¶¶ 61–80.) Specifically, Plaintiffs allege that R 150 breached its contractual duties to not encumber the Property's title, to keep it free from detritus, and to acquire certain government permits. (*Id.* ¶¶ 45–50.) They also filed a *lis pendens* on the Property. (Countercl. at 10–13 [ECF No. 29].)

R 150 removed the complaint to this court and filed a counterclaim for slander of title. (Countercl. ¶¶ 29–37.)

The matter is before the court on Plaintiffs' motion for leave to amend their amended complaint (ECF No. 78), R 150's motion to dismiss (ECF No. 13), R 150's motion to quash Reserve's memorandum of *lis pendens* (ECF No. 45), and R 150's motion for sanctions (ECF No. 32).

## II.   STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557). Courts ruling on 12(b)(6) motions can consider documents attached to the complaint as exhibits. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")).

### III.   ANALYSIS

#### A.  Threshold Matters

##### 1.   Choice of Law

Before addressing the merits, the court must determine which state's law applies to this diversity action. A federal court exercising diversity jurisdiction must apply the substantive law of the state in which it sits, including the state's choice-of-law rules. *Connor v. Covil Corp.*, 996 F.3d 143, 146 n.1 (4th Cir. 2021). Virginia's choice-of-law rules, then, apply here. Those rules stipulate that a contract is interpreted under the rules of the state where the parties formed it. *Black v. Powers*, 628 S.E.2d 546, 554 (Va. Ct. App. 2006) (citing *C.I.T. Corp. v. Guy*, 195 S.E. 659, 661 (Va. 1938)). Nothing in the pleadings suggests the parties entered this contract anywhere other than Virginia, and both parties have cited Virginia law in their filings.

Virginia law enforces valid choice-of-law provisions. *See Settlement Funding, LLC v. Von Neumann-Lillie*, 645 S.E.2d 436, 438 (Va. 2007). The parties chose Virginia law to govern their dealings by including a choice-of-law provision to that effect in the Option. (ECF No. 80-2, at 17.) Applying Virginia law, the court must honor that choice.

Virginia law controls the Option's interpretation.

##### 2.   Nature of the Real Estate Purchase Option Agreement

As a threshold issue, the parties dispute whether the Option is even a contract. R 150 contends that the parties executed merely "an agreement to agree." (Def.'s Resp. Opp'n Mot. Leave Amend at 19–31 [ECF No. 90].) And as such, the document's terms are unenforceable. Plaintiffs disagree, asserting that the Option is an enforceable contract. (*See* Pls.' Reply Mot.

Leave Amend at 5, 9 [ECF No. 92].) The court finds that the Option is a contract because it has all the basic elements of a contract, and it uses contract terms throughout.

"The basic elements of a contract are an offer, acceptance, and consideration." *Sfreddo v. Sfreddo*, 720 S.E.2d 145, 154 (Va. Ct. App. 2012) (citing *Snyder-Falkinham v. Stockburger*, 457 S.E.2d 36, 39 (Va. 1995)). Further, "mutuality of assent—the meeting of the minds of the parties—is an essential element of all contracts." *Phillips v. Mazyck*, 643 S.E.2d 172, 175 (Va. 2007); *see also Allen v. Aetna Cas. & Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981) (per curiam) ("[T]here must be mutual assent of the contracting parties to terms reasonably certain under the circumstances in order to have an enforceable contract.").

Here, consideration flows both ways. "Mutual promises between contracting parties constitute adequate consideration." *Davis v. Davis*, 835 S.E.2d 888, 895 (Va. 2019). Cathcart paid R 150 a monthly retainer. (*See* ECF No. 80-2, at 2–4.) In exchange, R 150 promised to keep the physical Property clear of debris and its title free of encumbrances, in addition to other commitments. (*See id.* at 6–7, 12). This is a contract. Nothing in the parties' briefing or course of conduct suggest that they did not mutually assent to these terms.

Further, familiar contract terms appear throughout the Option. It explicitly defines the consequences of either parties' failure to keep its promise to the other as a "breach." (*Id.* at 5, 10, 13, 14); *see Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016). It refers to their commitments to each other as "consideration." (ECF No. 80-2, at 1); *see Davis*, 835 S.E.2d at 895. It includes a choice-of-law provision. (ECF No. 80-2, at 17); *see Appalachian Reg'l Healthcare v. Cunningham*, 806 S.E.2d 380, 383 n.6 (Va. 2017). It has an integration clause. (ECF No. 80-2, at 17); *see Reid v. Boyle*, 527 S.E.2d 137, 144–45 (Va. 2000). It sets the purchase price for each

Parcel. (*See* ECF No. 80-2, at 5.) And it describes the acts the parties must perform before closing as "conditions precedent." (*Id.* at 8); *see Mathews v. PHH Mortg. Corp.*, 724 S.E.2d 196, 199–200 (Va. 2012); *see also* 13 Williston on Contracts § 38:7 (4th ed. 2021) (defining condition precedent as "either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises.").

The parties' ongoing mutual commitments and attendant remedies for breach distinguish the Option, an enforceable contract, from unenforceable agreements to agree. For example, in *Aetna Casualty*, an insurance company offered to "effect full and final settlement" with the plaintiff in exchange for his forbearance in hiring an attorney and suing. 281 S.E.2d at 819. The Supreme Court of Virginia held that "an agreement to make a settlement, without specifying more, constitutes only an agreement to negotiate at a later date." *Id.*

In *W.J. Schafer Associates, Inc. v. Cordant, Inc.*, a government contractor, Cordant, prepared a bid to digitize hard-copy records for the Air Force. 493 S.E.2d 512, 513–14 (Va. 1997). In preparing its bid, Cordant entered an agreement with subcontractors to "negotiate in good faith in a timely manner a Subcontract Agreement" for certain machinery if it won the bid. *Id.* at 514. Cordant won, and it demanded the subcontractors provide it with the contemplated machinery. *See id.* at 514. The subcontractors refused, insisting on the negotiation of a formal subcontract instead. *Id.* So Cordant sent them a termination letter and sued for breach. *See id.* at 514–15. The Supreme Court of Virginia reversed the jury verdicts in favor of Cordant because "[t]here was no mutual commitment by the parties, no obligation on the part of [the subcontractors] to sell the [machinery] or on the part of Cordant to purchase them [and] no

agreed purchase price for the product." *Id.* at 515. In short, the parties' "[a]greement was not enforceable against [the subcontractors] as a contract for the sale of goods." *Id.*

Similarly, in *Navar, Inc. v. Federal Business Council* two subcontractors entered into an agreement with a government contractor to negotiate in good faith upon the government contractor's receipt of a prime contract. 784 S.E.2d 296, 297. The government contractor's bid won, but negotiations between the parties failed to produce a contract. *Id.* at 298. The subcontractors sued for breach. *Id.* The Supreme Court of Virginia affirmed the trial court's ruling setting aside the jury verdict granting damages for the breach. *Id.* at 300. The court explained that the parties never "mutually agreed that Plaintiffs would be the actual subcontractors hired by [the government contractor] once the prime contract was awarded." *Id.*

In each of these cases the purported contracts lacked any enforceable remedies in the event of a breach. They were "too vague and indefinite to enforce." *See Aetna Cas.*, 281 S.E.2d at 819–20 ("As the agreement provided no reasonable basis for affording a remedy for its breach, it is too vague and indefinite to be enforced."); *Cordant*, 493 S.E.2d at 515 ("no agreed purchase price," in part, made agreement unenforceable); *Navar*, 784 S.E.2d at 300 (concluding agreement was not a contract, in part, because it "does not contain a [price], or any reasonably certain method for determining a [price]").

But that's not the case here. As explained above, the parties have meticulously defined their remedies if the other breaches. *See supra* I.

The Option is a contract.

### 3.  Proper Parties

R 150 next disputes whether Reserve is a proper party to this action. The Option identifies the purchasing parties as "Cathcart, or his permitted assigns." (ECF No. 80-2, at 1.) R 150 argues that Reserve is not a party to the agreement because Cathcart has not yet made an assignment to Reserve. (Def.'s Resp. Opp'n Mot. Leave Amend at 33–34.) Plaintiffs counter that Reserve is an "anticipated assignee." (Pls. Resp. Opp'n Mot. Dismiss at 5–6.) Like any other assignee, this argument goes, Reserve has standing to sue to enforce the Option. *See Union Recovery Ltd. P'ship v. Horton*, 477 S.E.2d 521, 523–24 (Va. 1996); *see also* Restatement (Second) of Contracts § 317 (Am. L. Inst. 1981).

Both parties overlook the controlling law. "[U]nder certain circumstances, a party may sue to enforce the terms of a contract even though he is not a party to the contract." *Tingler v. Greystone Homes, Inc.*, 834 S.E.2d 244, 268 (Va. 2019); *see* Va. Code Ann. § 55.1-119; Restatement (Second) of Contracts § 302. "[W]here the third party shows that the parties to the contract clearly and definitely intended it to confer a benefit upon him" the party can sue to enforce the contract as an intended third-party beneficiary. *Ogunde v. Prison Health Servs., Inc.*, 645 S.E.2d 520, 525 (Va. 2007) (cleaned up). The contract need not explicitly name a third-party beneficiary; courts can analyze the entire record to determine whether the parties contracted for the benefit of a third party. *Tingler*, 834 S.E.2d at 268–69.

Here, it seems obvious that R 150 and Cathcart intended the Option to benefit Reserve. The parties "expressly agree[d]" that Cathcart "may assign [his] rights . . . to a limited liability company in which [he] or any of his affiliates . . . is a managing member." (ECF No. 80-2, at 17–18.) Cathcart and "his permitted assigns" are the purchasers. (*Id.* at 1.) And Cathcart

11

established Reserve specifically so the company could manage the business affairs related to the apartments he intends to build on the Property. (Pls. Resp. Opp'n Mot. Dismiss at 2.) Cathcart and R 150, then, "clearly and definitely intended [the Option] to confer a benefit upon" Reserve. *See Ogunde*, 645 S.E.2d at 525; *see also* Restatement (Second) of Contracts § 302 ("[Reserve] is an intended beneficiary if recognition of a right to performance in [Reserve] is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that [Cathcart] intends to give [Reserve] the benefit of the promised performance").

Whether the parties specifically had Reserve in mind when they contracted does not matter. "It is not essential to the creation of a right in an intended beneficiary that he be identified when a contract containing the promise is made." *See* Restatement (Second) of Contracts § 308. Consider two canonical examples. Life insurance policies are often payable to children who were not born when the insured first purchased the policy—the child eligible for the benefit can sue to enforce the contract. *Id.* ill. 1. Or a lender might offer to pay for a borrower's purchase from a to-be-determined merchant, even if neither knows the merchant's identity. The merchant can sue to enforce the agreement from which she benefitted. *Id.* ill. 2.

Virginia precedent underscores this point. For example, individual inmates can sue to enforce the healthcare-services contract between providers and prisons because they are intended third-party beneficiaries of that contract. *See Ogunde*, 645 S.E.2d at 525–26. In all these examples, the contracting parties do not know the identities of the intended third-party beneficiaries. But the contract's terms contemplate a third party—a child, a merchant, an inmate—receiving the benefit of one party's performance.

Such is the case here. The Option contemplated that Reserve, as Cathcart's intended assignee, would benefit from R 150's compliance with its terms. (*See* ECF No. 80-2, at 1.) A nonparty, identifiable during negotiations or not, in that position can sue to secure for itself the benefit of those terms.

Reserve is a proper party to this action.

## B. Leave to Amend[3]

Civil litigants may amend their pleadings with the court's leave, which courts "should freely grant [] when justice so requires." Fed. R. Civ. P. 15(a)(2). "Motions for leave to amend should generally be granted." *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 293 (4th

---

[3] A motion for leave to amend under Rule 15(a) that is filed after the time allowed by the court's scheduling order is functionally a motion for both leave to amend and for modification of the scheduling order under Rule 16(b). *See Essential Hous. Mgmt., Inc. v. Walker*, 166 F.3d 332, *4 (4th Cir. 1998) (per curiam) (unpublished Table decision). Parties seeking modification of a scheduling order must show that "good cause" exists for the modification. *See Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 299 (4th Cir. 2008). Here, neither party briefed this standard, and R 150 does not raise it in its opposition brief. So the court concludes that R 150 has forfeited any argument that Plaintiffs' motion should be denied because there is not good cause to modify the operative scheduling order. *See Laber v. Harvey*, 438 F.3d 404, 427 n.23 (4th Cir. 2006) (en banc).

This forfeiture notwithstanding, good cause for the modification exists here. "Rule 16(b)'s 'good cause' standard emphasizes the diligence of the party seeking the amendment." *Valle v. Karagounis*, No. 1:19-cv-03764, 2020 WL 5505299, at *2 (D.D.C., Sept. 11, 2020) (quoting *O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 155 (1st Cir. 2004)). As an initial point, Plaintiff is not responsible for any of the delays in this case to date. *See infra* III.B.1 n.4. Plaintiffs' motion for leave to amend is based on the court's expressed concerns aired at the original hearing on R 150's motion to dismiss. (First Hr'g Tr. at 30, 31 [ECF No. 82].) Once he had heard those complaints, and while the motion was still pending, Plaintiffs' counsel filed a motion for leave to amend eight days later. There is no suggestion that Plaintiffs' counsel has failed to diligently pursue his client's rights. *See Valle*, 2020 WL 5505299, at *2–3 (granting motion for modification after discounting the length of the delay in filing for leave to amend where portions of the delay were "outside Plaintiffs' control"); *compare Walker*, 166 F.3d at *4 (denying motion for modification where the delay was entirely attributable to lawyer's "lack of diligence"). Further, that the proposed amendment does not change the nature of Plaintiffs' specific performance claim or necessitate duplicative or additional discovery weighs in favor of finding good cause. *See Wall v. Fruehauf Trailer Servs., Inc.*, 123 F. App'x 572, 577 (4th Cir. 2005). And specific performance is a fact-driven claim that a plaintiff might effectively restate with leave to amend after an order granting a motion to dismiss. *See Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 293 (4th Cir. 2018); *cf. Moore v. Equitrans, L.P.*, 818 F. App'x 212, 217–19 (4th Cir. 2020) (reversing a district court's denial of a motion to modify a scheduling order, in part, because "on the present record, we cannot determine whether amendment is indeed futile"). So judicial economy is served by allowing a motion for leave to amend while such an order remains pending as well. *See Wall*, 123 F. App'x at 577 (judicial economy weighs in favor of a finding of good cause).

Cir. 2018). "[L]eave to amend should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.,* 576 F.3d 172, 193 (4th Cir. 2009).

R 150 principally argues that Plaintiffs' motion for leave to amend is prejudicial and futile. Because the procedural history to date and the proposed pleadings do not support either of these grounds, Plaintiffs' motion for leave to amend (ECF No. 78) will be granted.

### 1. Prejudice

R 150 asserts that Plaintiffs' motion is prejudicial because the court has already held oral argument on R 150's motion to dismiss, because Plaintiffs waited ten months to file it,[4] and because the claim for specific performance sustains a *lis pendens* on R 150's property. The court will treat each argument in turn.

As an initial point, that Plaintiffs filed his motion after the court had already conducted a hearing in this matter does not prejudice R 150. Plaintiffs' oral motion for leave to amend

---

[4] Further, in the specific context of this case, the parties and the court have not taken an inordinate amount of time to resolve R 150's motion to dismiss. Defendants removed this case to federal court on March 16, 2021. (ECF No. 1.) Judge Moon transferred the case to this court on July 14, 2021. (ECF No. 28.) This court promptly set a hearing for August 24, 2021. (ECF No. 31.) That hearing was postponed on August 16, 2021 and rescheduled on August 26, 2021 for October 8, 2021. (ECF Nos. 41, 47.) The court postponed the hearing a second time on August 31, 2021 to accommodate other matters pending before it and to give the parties an opportunity to mediate, which they requested. (ECF No. 49.) The hearing was set for November 15, 2021 on October 20, 2021. (ECF No. 62.) At that hearing, the court expressed concerns about Plaintiffs' claim for specific performance. (First Hr'g Tr. at 30, 31.) Plaintiffs moved for leave to amend eight days later, while the motion to dismiss was pending. (ECF No. 78.) And nine days after that filing, before R 150 had filed its opposition, the court set a hearing on Plaintiffs' motion for January 10, 2022. (ECF No. 86.) There is no question that six months is longer than the court would like even a complicated motion to dismiss to remain pending. But under these circumstances—spanning two postponements, an attempted mediation, a formal motion for leave to amend necessitating another hearing, the Thanksgiving holiday, and the Christmas holiday—this lag cannot constitute prejudice to R 150 such that Plaintiffs' motion for leave to amend must be denied.

was under advisement when they supplemented that motion with a written brief. (*See* First Hr'g Tr. at 59 [ECF No. 82].) Indeed, if the court had concluded that Plaintiffs had insufficiently alleged his claim for specific performance, it may have dismissed the claim without prejudice and with leave to amend. *Adbul-Mumit*, 896 F.3d at 293

The Federal Rules express a preference for deciding cases on the merits rather than on technicalities. *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). This "requires that [a] plaintiff be given every opportunity to cure a formal defect in his pleading." *Ostrzenski v. Siegel*, 177 F.3d 245, 252–53 (4th Cir. 1999) (citation omitted). As a result, dismissals with leave to amend are appropriate when pleading additional facts may state a claim upon which relief can be granted. *See, e.g.*, *Laber*, 438 F.3d at 426–29 (reversing denial of motion for leave to amend because the proposed complaint "does allege a cause of action"); *Ostrzenski*, 177 F.3d at 252–53 (same because "[t]here is no indication from any source that [plaintiff] could not have amended his complaint to allege representations in the report that were highly offensive" for purposes of alleging slander.).

This is such an instance. Plaintiffs' counsel represented at the first hearing that, if the court dismissed the specific performance claim but allowed leave to amend, he would be able to add allegations bolstering that claim. (*See* First Hr'g Tr. at 29–31, 45, 55.) Plaintiffs could have made this motion even if the court had dismissed their claim for specific performance with prejudice. *See Adbul-Mumit*, 896 F.3d at 293. Plaintiffs' decision to preemptively file a formal motion they would have been entitled to file anyway did not prejudice R 150.

R 150 further faults Plaintiffs' for filing this motion ten months after his initial complaint and his amendment as of right. But delay alone is never an independently sufficient

reason to deny a motion for leave to amend. *Laber*, 438 F.3d at 427. Accordingly, courts generally consider how advanced proceedings are when evaluating prejudice, not how long they have been pending. *See Pine Mountain Oil & Gas, Inc. v. Equitable Prods. Co.*, 446 F. Supp 2d 643, 649–51 (W.D. Va. 2006) (denying motion for leave to amend as prejudicial, in part, because it was filed after the district court had already granted summary judgment to the defendant); *see also Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987) ("Amendments near the time of trial may be particularly disruptive, and may therefore be subject to special scrutiny.").

To be sure, various motions to compel and motions to quash are pending. (*See* ECF Nos. 59, 64, 69, 76, 94.) But this case is still at the motion to dismiss stage; whatever discovery has been conducted to this point has been limited in scope. This case is thus not at such an advanced stage that granting Plaintiffs' motion for leave to amend would prejudice R 150.

The brunt of R 150's prejudice, then, is that this litigation—and specifically Plaintiffs' claim for specific performance—sustains a *lis pendens* that prevents it from effectively marketing and selling the land that it may have previously agreed to sell to Cathcart. (Def.'s Resp. Opp'n Mot. Leave Amend at 7.) The court is sensitive to the unique difficulties that R 150 faces in this case. But a defendant's duty to defend itself in court cannot provide the prejudice necessary to defeat a plaintiff's motion for leave to amend. *See Bylin v. Billings*, 568 F.3d 1224, 1230 (10th Cir. 2009) ("[T]he expenditure of time, money, and effort alone is not grounds for a finding of prejudice."); *Block v. First Blood Assocs.*, 988 F.2d 344, 351 (2d Cir. 1993) (similar); *Class Produce Grp., LLC v. Harleysville Worcester Ins. Co.*, No. ELH-16-3431, 2017 WL 2377105, at *9 (D. Md. May 31, 2017) (similar). If outright expenditures cannot constitute prejudice, then opportunity cost cannot either. This is especially true here, where Plaintiffs

brought this lawsuit and filed a *lis pendens* to prevent R 150 from selling to another what he alleges he already purchased. While these proceedings burden R 150's business dealings, that prejudice is incidental to the nature of Plaintiffs' specific performance claim.

R 150's prejudice, while real, is insufficient to justify denial of Plaintiffs' motion for leave to amend.[5]

---

[5] Related to its argument about prejudice, R 150 also asserts that Plaintiffs' motion for leave to amend violates Virginia's prohibition on approbation and reprobation. (Def.'s Resp. Opp'n Mot. Leave Amend at 7–11.) In other words, Virginia prohibits litigants from advancing successive contradictory positions during the course of a litigation to their advantage. *See Wooten v. Bank of Am., N.A.*, 777 S.E.2d 848, 849–50 & nn. 1, 3 (loosely explaining some of the contours of the approbation/reprobation doctrine, including that it can apply to either legal or factual assertions and that no judicial reliance on the first assertion is necessary for the doctrine's application, without concretely defining the doctrine); *Matthews v. Matthews*, 675 S.E.2d 157, 160–61 (Va. 2009) (analogizing the doctrine to judicial estoppel).

At the outset, the court notes that whether approbation/reprobation is a substantive of procedural issue under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938) and *Hanna v. Plumer,* 380 U.S. 460 (1965) is unclear. Neither of the two previous federal courts to address the doctrine analyzed this issue. *See Zamma Canada Ltd. v. Zamma Corp.*, No. 3:20cv353, 2020 WL 7083940, at *5–6 (E.D. Va. Dec. 3, 2020); *Peraton, Inc. v. Raytheon, Co.*, No. 1:17-cv-979, 2018 WL 10436093, at *2–3 (E.D. Va. Jan. 24, 2018). The parties haven't raised this *Erie* issue, however, and because the court concludes that Virginia law and federal law mandate the same result, the court need not resolve the issue. *See Homeland Training Ctr., LLC v. Summit Point Auto. Rsch. Ctr.*, 594 F.3d 285, 293 n.1 (4th Cir. 2010).

The court rejects R 150's approbation/reprobation argument for two independent reasons. First, the Supreme Court of Virginia has suggested that approbation/reprobation does not bind parties to their earlier pleadings. *Wooten* cites *Berry v. Klinger*, 300 S.E.2d 792 (Va. 1983), as a case applying approbation/reprobation. *Wooten*, 777 S.E.2d at 850 n.1. And the cited portion of *Berry* explicitly states that "*[u]nless amended*, a litigant's pleadings are binding upon him. His opponent is entitled to rely upon the position he takes, and should be able to prepare for trial with the assurance that this position will not be suddenly changed without notice." *Berry*, 300 S.E.2d at 795 (emphasis added). R 150 has not identified any Virginia case, nor has the court located one after exhaustive research, applying the approbation/reprobation doctrine to deny a motion for leave to amend. And so the court concludes that this doctrine is inapplicable here.

The proposed second amended complaint ends any confusion on Plaintiffs' position for the rest of the litigation—they maintain that "[t]hrough an express offer and acceptance, unambiguous documents, and site plans incorporated by reference in the Third Amendment, R 150 agreed to sell [Cathcart] specific, certain, and definite land under the Agreement." (Pls.' Br. Supp. Mot. Leave Amend Compl. at 1 [ECF No. 80].)

Second, the court notes that both parties have toed the line of advancing inconsistent legal theories at this stage. Plaintiffs' past filings have sometimes taken inconsistent factual positions. (*Compare* Pls.' Resp. Opp'n Mot. Sanctions at 4 [ECF No. 48] (explaining the anticipated sale's exact location and attaching exhibits showing the same), *with id.* at 7 ("the Purchasers seek to enforce the entire Agreement, including Purchasers' option to buy its optioned acreage from any or all of the three tax parcels comprising the Property.").) For its part, R 150 has argued both that the parties never have agreed to any conveyance whatsoever and that the parties would have agreed to a conveyance that burdens only one Tax Map No. (*Compare* Def.'s Br. Supp. Mot. Dismiss at 5 [ECF No. 14] ("Plaintiffs seek to force Defendant to sell three parcels of land which are not defined by the Agreement."), *with* Def.'s Br. Supp. Mot. Sanctions at 2 [ECF No. 33] ("[H]ad the parties negotiated by separate agreement the boundaries, the 26.23 acres would have been part of just one of the tax map tracts owned by

## 2. Futility

R 150's stronger argument relates to futility. A proposed amended complaint is futile if it "fails to state a claim under the applicable rules and accompanying standards." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). Functionally, then, R 150's opposition to Plaintiffs' motion for leave to amend on futility grounds is "a preemptive motion to dismiss the new proposed pleading." *Best v. Newrez LLC*, No. GJH-19-2331, 2020 WL 5513433, at *9 (D. Md. Sept. 11, 2020); *cf. Coleman v. Funkhouser*, No. 6:20-cv-00049, 2021 WL 4487136, at *3 (W.D. Va. Sept. 30, 2021) (terminating a defendant from the case after granting leave to amend where the amended complaint's attempt to state a claim as to that defendant was "futile").

R 150 makes four arguments for why Plaintiffs' motion is futile. First, R 150 claims that Plaintiffs' decision to make specific performance contingent upon a "willful" breach makes the remedy unavailable for a breach of contract, or, alternatively, that Plaintiffs have failed to allege willfulness. Second, R 150 asserts that the conveyance is undefined, and the court cannot award specific performance. Third, R 150 argues that it did not breach because it properly terminated the Option after both itself and Plaintiffs failed to perform conditions precedent necessary for closing. And fourth, R 150 contends that, even if the conveyance is defined, the terms of any specific performance would be too indefinite for the court to order and enforce.

---

Defendant.").) To some degree, then, whatever contradictory statements Plaintiffs have made were responsive to R 150's own alternative positions. *Cf.* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Plaintiffs did not approbate and reprobate merely by responding to R 150's multiple arguments.

This section will proceed in two steps. First, the court will determine whether Plaintiffs plausibly have alleged claims for specific performance and breach. *See Iqbal*, 556 U.S. at 678–79. Second the court will address the four arguments R 150 offers in support of its motion for leave to amend based on futility.

### i. Plaintiffs' Allegations of Breach

Similarly, Plaintiffs plausibly have alleged a claim for breach of contract. "The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Navar*, 784 S.E.2d at 299 (cleaned up). The court will address these three elements in turn.

The first element is met because, as explained above, the Option is a valid contract. *See supra* III.A.2.

Second, Plaintiffs have explicitly alleged multiple breaches of the Option, including:

- Plaintiffs allege that R 150 granted a 2018 Deed and a 2020 Deed of Trust against the Property to third parties without notice to or written consent from him. (Pls.' Proposed Second Am. Coml. ¶ 45.) Plaintiffs allege that these encumbrances breached R 150's obligation to "not . . . materially and adversely affect title to any portion of the Property" without Cathcart's written consent. (*See* ECF No. 80-2, at 4.)

- Plaintiffs allege that R 150 stockpiled dirt on the Property and failed to remove the dirt despite his request. (Pls.' Proposed Second Am. Coml. ¶ 45.) Plaintiffs allege that this action breached R 150's obligation to "not stockpile dirt or any other materials on any Parcel" without Cathcart's prior approval. (*See* ECF No. 80-2, at 12.)

- Plaintiffs allege that R 150 failed to secure certain design approvals from Frederick County for a 10-foot asphalt trail. (Pls.' Proposed Second Am. Coml. ¶ 45.) Plaintiffs allege that this failure breached R 150's obligation in the Third Amendment to "design, complete, and obtain all necessary approvals" for the trail. (*See* ECF No. 80-14, at 2.)

Further, Plaintiffs proposed second amended complaint suggests that this list is nonexhaustive. (*See* Pls.' Proposed Second Am. Coml. ¶ 67 (listing these examples, and others, with the introduction "which include, without limitation").) The second element of breach of contract, an alleged breach, is sufficiently pleaded here.

Third, under the contract's terms, Cathcart is entitled to certain damages if he can prove the breaches. In the event of a breach, Cathcart retains all remedies, like damages, available at law. (*See* ECF No. 80-20, at 13–14.) And if successful "in any action for damages arising from or relating to this Agreement, [Cathcart] shall be entitled to recover from [R 150] only the actual costs and expenses incurred by [Cathcart] in connection with the Property and the enforcement of [Cathcart's] rights under this Agreement." (*Id.* at 14.) Indeed, Plaintiffs have pleaded that his damages include, but are not limited to, "the costs of surveys, tests, design fees, and other investigations, along with its reasonable attorney's fees, in an amount of $1,400,000." (Pls.' Proposed Second Am. Coml. ¶ 89.) Plaintiffs have sufficiently alleged all three elements of breach of contract.

### ii.  Plaintiffs' Allegations of Specific Performance

Specific performance is both an equitable cause of action and an equitable remedy. *See Denton v. Browntown Valley Assocs., Inc.*, 803 S.E.2d 490, 494 (Va. 2017); *see also* 25 Williston on Contracts § 67:1. The Option explicitly lists specific performance as a remedy for a "willful breach." (ECF No. 80-2 at 13.)

"Under Virginia law, each piece of real estate is unique, and specific performance is the preferred remedy for breach of a contract to convey real property." *Ndeh v. Midtown Alexandria, LLC*, 300 F. App'x 203, 207 (4th Cir. 2018) (per curiam) (citing *Walker v. Henderson*, 145 S.E.

311, 317 (Va. 1928)). In a contract conveying land or an interest in land, the main object of the description "is not in and of itself to identify the land sold . . . but to furnish the means of identification, and when this is done it is sufficient." *Firebaugh v. Whitehead*, 559 S.E.2d 611, 615 (Va. 2002) (quoting *Harper v. Wallerstein*, 94 S.E. 781, 782 (Va. 1918)). "The description of the subject property must be sufficient 'to afford the means, with the aid of extrinsic evidence, of ascertaining with accuracy what is conveyed and where it is.'" *Id.* (quoting *Smith v. Bailey*, 127 S.E. 89, 93 (Va. 1925)). "The description need not be given with such particularity as to make a resort to extrinsic evidence [unnecessary]." *Id.* (quoting *Pavlock v. Gallop*, 154 S.E.2d 153, 156 (1967)).

On the other hand, "a contract relating to the sale of land which is incomplete, uncertain, or indefinite in its material terms will not be specifically enforced by a court of equity." *Wilburn v. Mangano*, 851 S.E.2d 474, 476 (Va. 2020); *see also* 25 Williston on Contracts § 67:4. For instance, the Supreme Court of Virginia has held that specific performance was unavailable for a contract conveying "100 acres of land lying in Grayson county and on Garrett's Knob adjoining the Carson land." *Grayson Lumber Co v. Young*, 86 S.E. 826, 827 (Va. 1915); *see also id.* at 827–28 (collecting similarly indefinite descriptions from other cases). And relevant to this case, "where it appeared that the contract described no definite boundary . . . out of a larger boundary, it was conceded that the contract was void for uncertainty in its description of the land." *Smith v. Mullen*, 75 S.E. 130, 131 (Va. 1912).

Plaintiffs have sufficiently alleged a claim for specific performance. The court plausibly can identify Parcel 1 by reference to the Option and its Amendments. When R 150 signed the Third Amendment, it committed to "design, complete, and obtain all necessary approvals for

[a] proffered 10-foot asphalt pedestrian and bicycle trail." (ECF No. 80-14, at 2.) The parties

anticipated that acquiring these approvals would take less than a month. (*See id.*) R 150 further

agreed to "coordinate the design of the Trail to account for the layout presently shown on

Purchaser's site plans, dated April 30, 2020 with a November 20, 2020 revision date." (*Id.*)

These plans were not attached to Plaintiffs' amended complaint, but they are attached to his

proposed second amended complaint. (*See generally* ECF Nos. 80-15, 80-16.)

The incorporated site plans include images of both the entire anticipated conveyance

and the smaller Parcel 1. (*See, e.g.*, ECF No. 80-15, at 3, 4 (entire anticipated conveyance); *id.*

at 7, 8 (Parcel 1)). The images are finely detailed, including pictures of where the complex's

hot tub would sit, as well as where its United States and Virginia flags would fly. (ECF No.

80-16, at 8.) In the most precise images, an inch represents only ten feet. (*See, e.g.*, *id.*) And

several show the location of the telltale asphalt trail referenced in the Third Amendment. (*See,*

*e.g.*, ECF No. 80-15, at 5, 7.) In sum, the site plan plausibly identifies Parcel 1's boundaries.

Given the incorporated site plans' precision and the parties' decision to permit a trail

based on the trail's location in the site plans, the court finds it plausible that the parties had

agreed to Parcel 1's final location. Plaintiffs' proposed amended complaint, then, plausibly

alleges a claim for specific performance of Parcel 1.

### iii.  Willful Breach

As explained above, R 150 offers four reasons why Plaintiffs' motion for leave to

amend its complaint should be denied as futile. The court will now consider each of those in

turn. R 150's threshold argument against specific performance focuses on how the parties

qualified the remedy's availability in the Option. Specific performance is only available as "a consequence of or due to a willful breach by [R 150]." (ECF No. 80-2, at 13.)

R 150 observes that there is no distinction between an intentional breach and a negligent breach. (*See* Def.'s Resp. Opp'n Mot. Leave Amend at 32 (citing Restatement (Second) of Contracts ch. 16, Introductory Note ("'Willful' breaches have not been distinguished from other breaches.")).) But the thrust of this argument is unclear. On the one hand, R 150 suggests that the Option limits the availability of specific performance to tort claims. (*See id.* at 32–33.) On the other hand, if the parties properly limited the availability of specific performance to only "willful" breaches, R 150 argues that the proposed second amended complaint fails to allege willfulness. (*Id.* at 33.)

As to the first argument, specific performance is a contract remedy, not a tort remedy. To be sure, intent is irrelevant for the court's determination of whether a party has breached. But the court sees no reason the parties cannot condition the availability of a contract remedy on the breaching party's intent. In tort and criminal cases involving contracts, courts often consider the breaching party's intent. *See, e.g.*, *Klinker v. First Merchants Bank, N.A.*, 964 N.E.2d 190, 193–95 (Ind. 2012) (civil fraud); *State v. Mermis*, 20 P.3d 1044, 1049 (Wash. Ct. App. 2001) ("The difference between theft and breach of contract . . . is criminal intent."); 18 Am. Jur. 2d. *Conversion* § 156 (2021). There is no obvious reason why the parties cannot bargain with each other to have the court undertake a similar analysis here.

As to the second argument, the court disagrees with R 150's characterization and finds that Plaintiffs have pleaded sufficient facts to plausibly allege willfulness. To take one instance, the Option prohibits encumbrances to title. (ECF No. 80-2, at 6–7.) R 150 entered at least

two deeds with third parties that encumbered the Property. (*See* ECF Nos. 80-3, 80-10.) R 150 could not have entered those agreements anything but willfully—it knew the Option prohibited the agreements, and it signed them anyway. Accordingly, the parties here permissibly limited the availability of performance to "willful" breaches and Plaintiffs sufficiently alleged willfulness.

### iv.   Integration Clause

R 150 next argues that Plaintiffs' proposed second amended complaint is futile and specific performance unavailable because the Option and its three Amendments never explicitly delineate Parcel 1's boundaries. R 150 argues that, because the Option includes an integration clause, the court cannot consider any other documents that purport to show that the parties agreed to a conveyance's location. (*See* Def.'s Resp. Opp'n Mot. Leave Amend at 16–19.)

Generally, integration clauses defeat the use of parol evidence to amend contract terms, subject to "clear, unequivocal and convincing evidence, direct or implied." *Reid*, 527 S.E.2d at 144–45; *see also* 11 Williston on Contracts § 33:23 (describing integration clauses as "presumptive evidence of the parties' intentions as to integration"). The Option's integration clause is no different. (ECF No. 80-2, at 17.) Plaintiffs and R 150 expressly agreed that the Option "contains the entire agreement between the parties relating to the Property and supersedes all prior and contemporaneous negotiations, understandings and agreements, written or oral, between the parties." (*Id.*) This term expressly limited amendment of the

Option to "written instrument[s] authorized and executed with the same formality as this Agreement." (*Id.*)[6]

The Third Amendment includes a commitment by R 150 to "coordinate the design of the Trail to account for the layout presently shown on Purchaser's site plans, dated April 30,

---

[6] Throughout the proceedings, R 150 implicitly has argued that the Option requires the parties to set Parcel 1's boundaries via a formal amendment. (*See, e.g.,* Def.'s Resp. Opp'n Mot. Leave Amend at 12 ("The allegations in the Second Amended Complaint manifestly fail to alter the reality that the Agreement is devoid of any reference to a memorialized defined Parcel."); *id.* ("The Second Amended Complaint does not, because Plaintiffs cannot, allege that the parties had identified and agreed on a Phase One and/or Phase Two Parcel per the express terms of the Agreement.")). At the pleadings stage, the court credited R 150's implicit assumption (which Cathcart did not contest) and limited its review of plausible, agreed-to locations for Parcel 1 to the Option and its Amendments. *See supra* III.C.3.ii.

But it is not clear that the Option requires formal amendment regarding Parcel 1's location in advance of R 150's subdivision of Parcel 1. Indeed, because the attachment of Exhibits B and C is contingent on R 150's having already subdivided the Property, the Option suggests the opposite—that the parties would negotiate the boundaries of each Parcel informally, R 150 would subdivide the Property appropriately, and then Cathcart would attach a finalized site plan and legal description to the Option before closing.

Much changes if R 150's assumption is wrong. Most critically, the integration clause would have no bearing on negotiations over Parcel 1's location because those conversations would not be contract terms. The Option explicitly leaves the location of each Parcel undefined. (ECF No. 80-2, at 5.) And "when the entire agreement has not been reduced to writing, parol evidence is admissible, not to vary or contradict the terms of the written instrument, but to show other facts agreed upon in order to establish the parties' entire contract." *R.K Chevrolet, Inc. v. Hayden,* 480 S.E.2d 477, 480 (Va. 1997); *see also* 11 Williston on Contracts § 33:21. While the parties could not use peripheral communications to contest or alter the site plan eventually attached as Exhibit B, they can use them to prove whether the parties had agreed to Parcel 1's location. Without the ability to consider the parties' communications, it is not clear how the court could determine whether R 150's contractual duty to subdivide the Property had vested. (*See* ECF No. 80-2, at 8.)

The upshot would be that the court freely could consider the parties' communications about Parcel 1 when determining whether the parties had agreed to Parcel 1's location. *See Firebaugh,* 599 S.E.2d at 615 (extrinsic evidence can supplement the property description in a contract for the sale of land). The proposed second amended complaint attaches documents suggesting the parties had agreed to Parcel 1's location. For instance, R 150 sent Cathcart a draft deed proposing the sale the Parcel 1 for $3,198,000 and defining Parcel 1's size *to the one-thousandth of an acre.* (ECF No. at 80-12, at 5.) The same email attaching the draft deed also enclosed a draft subdivision plat. (*Id.* at 53–56.) And R 150 further informed Cathcart that it "stands ready to close on the sale of that certain tract of land which is more specifically described in the attached draft Deed and depicted on the attached and incorporated plat." (*Id.* at 1.) The next day, Cathcart responded confirming the accuracy of the subdivision plat. (*See* ECF No. 80-13, at 2.) (The court lacks the expertise to determine whether the attached subdivision plat incorporated the same boundaries as Cathcart's site plan.)

About a week later, having exchanged these communications, the parties signed the Third Amendment to facilitate closing on Parcel 1. (ECF No. 80-14, at 4–5.) That Amendment incorporated Cathcart's site plan by reference at least for purposes of setting the asphalt trail's location. (*Id.* at 2.) But the parties' other communications suggest R 150 also relied upon Cathcart's site plan to set Parcel 1's closing price. Cathcart's site plan reveals a blueprint for 246 units. (ECF No. 80-15, at 5; *see also* ECF No. 48-3, at 1.) The Option sets the purchase price for Parcel 1 at $13,000 per unit. (ECF No. 80-2, at 5.) And 246 units at $13,000 per unit produces a total price of $3,198,000. This is the price listed on R 150's draft deed. (ECF No. at 80-12, at 5.)

2020 with a November 20, 2020 revision date. Seller shall have such design and approvals from the County by not later than January 29, 2021." (ECF No. 80-14, at 2.) The question, then, is whether this language incorporated Plaintiffs' site plans by reference. *See Mathews*, 724 S.E.2d at 200–03. Because the Supreme Court of Virginia has never articulated requirements for incorporation by reference, the court must predict how that court would rule. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–79 (1938). To make this prediction, the court applies common law principles. *See Logan & Kanawha Coal Co., LLC v. Detherage Coal Sale, LLC*, 514 F. App'x 365, 367–69 (4th Cir. 2013) (attributing common law requirements for incorporation by reference to West Virginia law where the West Virginia Supreme Court had never addressed the issue).

The Fourth Circuit has broken incorporation by reference down into three elements. "Incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship." *Id.* at 367–68 (quoting *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 (3d. Cir. 2003)).

The first two elements are clearly met. The Third Amendment requires the trail's design "to account for the layout presently shown on [Plaintiffs'] site plans, dated April 30, 2020 with a November 20, 2020 revision date." (ECF No. 80-14, at 2.) Plaintiffs shared these site plans with Reserve on December 18, 2020. (ECF No. 80-15, at 1.) The Third Amendment's description clearly identifies the documents and makes them ascertainable by referencing their creation and revision dates. There could have been no doubt as to which document the parties were referring.

Whether the incorporation imposes surprise or hardship is a closer question. Documents may be incorporated by reference for limited purposes. *See VNB Mortg. Corp. v. Lone Star Indus., Inc.*, 209 S.E.2d 909, 913 (Va. 1974). And the Third Amendment primarily referenced the site plan to set the location of the referenced asphalt trail. (ECF No. 80-14, at 2.) There is no dispute that R 150 agreed to get the county's approval for an asphalt trail on its property pursuant to the Third Amendment. Incorporating this obligation into the contract cannot cause R 150 surprise or hardship.

The site plan's depiction of Parcel 1's location presents a more difficult issue. To be sure, agreeing to lay down an asphalt trail is a much smaller commitment than erecting 246 housing units. (*See* ECF No. 80-15, at 5; *see also* ECF No. 48-3, at 1.) Indeed, R 150 goes so far as to say that the argument "strains credulity." (Def.'s Resp. Opp'n Mot. Leave Amend at 29.)

Think about it the other way, though. It also "strains credulity" to suggest that the parties agreed to the trail's location without having agreed to the development's location. Why would two sophisticated entities negotiating a residential development place a trail before they set the apartments' locations? The court is skeptical that in a deal like this, the parties would agree to the placement of recreational trails before determining where the actual construction would take place.

It is therefore plausible that the Third Amendment's incorporation of Plaintiffs' site plan was done for purposes of both setting the asphalt trail's location and confirming the eventual construction's location—the former's incorporation only makes sense if the parties had already agreed to the latter.

Even limiting its review to the Option and its attachments, the court concludes that Plaintiffs have plausibly alleged that the parties had agreed to Parcel 1's location.

### v. Failure of Conditions Precedent

Third, R 150 argues that certain conditions precedent to the potential sale of Parcel 1 were never satisfied. (Def.'s Resp. Opp'n Mot. Leave Amend at 12–16.) If this is right, then Plaintiffs' proposed second amended complaint is futile as to both causes of action.

A condition precedent "is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises." 13 Williston on Contracts § 38:7. The Option includes many conditions precedent. For instance, it was R 150's duty to ensure that the Parcel 1 "shall have been subdivided from the [Property] into a separate tax parcel" before closing. (*See* ECF No. 80-2, at 8–9.) And Plaintiffs were required to circulate a final Site Plan and legal description of Parcel 1 to R 150 and attach those same documents to the Option before closing. (*See id.* at 1, 6, 21, 22.)

The brunt of this argument is two-fold. First, R 150 failed to meet certain conditions precedent to the sale of Parcel 1. If this is true, then R 150 properly terminated the Option, the parties' duties to close never vested, and specific performance of those duties would be inappropriate. Second and alternatively, Plaintiffs failed to satisfy certain conditions precedent for the sale of Parcel 1. This would similarly mean the parties were never able to close, and specific performance would be inappropriate.

The court will consider R 150's conditions precedent first. If a party causes "the failure of performance of a condition upon which his own liability depends, he cannot take advantage of the failure." *Parrish v. Wightman*, 34 S.E.2d 229, 232 (Va. 1945). Stated differently, R 150

28

cannot complain that the circumstances necessary for performance never came about if it had a duty to bring them about and took steps to ensure they did not. *Rastek Constr. & Dev. Corp. v. Gen. Land Com. Real Est. Co.*, 806 S.E.2d 740, 745–48 (Va. 2017).

Plaintiffs plausibly have alleged this to be the case here. For example, Plaintiffs have argued that R 150's failure to file its prepared subdivision plat is the very conduct that prevented the parties from specifically defining the boundaries of Parcel 1. (*See* Pls.' Reply Br. Mot. Leave Amend at 12.) R 150's failure to perform conditions precedent for which it was responsible does not render specific performance unavailable. *Rastek*, 806 S.E.2d at 746. Indeed, Plaintiffs have argued that R 150's failure to file its prepared subdivision plat is the very conduct that prevented the parties from specifically defining the boundaries of Parcel 1. If appropriate, the court could order R 150 to specifically perform that condition precedent to its "best efforts." *See Cangiano v. LSH Bldg. Co.*, 623 S.E.2d 889, 894–96 (Va. 2006).

But what about Plaintiffs' failed conditions precedent? R 150 asserts that Plaintiffs failed to meet two of its own conditions precedent. First, R 150 alleges that Plaintiffs did not send R 150 a Notice of Exercise confirming its intent to purchase Parcel 1 before the Study Period ended, as the Option required. (*See* ECF No. 80-2, at 4–5.) If Plaintiffs failed to do so, then the Option terminated without any additional action being required of either party. (*Id.* at 5.)

Consider the Notice of Exercise argument first. To purchase Parcel 1, the Option required Cathcart to deliver a Notice of Exercise to R 150 before the Study Period ended. (*See* ECF No. 80-2, at 4–5.) If Cathcart failed to do so, then the Option terminated without any additional action being required of either party. (*Id.* at 5.) But the wrinkle is that, in practice,

the parties' Second Amendment ended the Study Period and set a date certain for Cathcart to close on Parcel 1. (*See* ECF No. 80-7, at 2.) Given this resolution, an additional Notice of Exercise as to Parcel 1 would be redundant. Indeed, to the extent that the original Option terms required an additional Notice of Exercise, the Second Amendment "control[s], govern[s], and supersede[s]" that obligation. (*Id.* at 3.) Plaintiffs have plausibly alleged that the Second Amendment served as his Notice of Exercise to R 150.

Second, R 150 argues that Cathcart failed to attach exhibit B (a site plan) and exhibit C (a legal description) to the Option, which was supposed to be done before the study period terminated. Cathcart has two obligations regarding exhibit B.  First, he had to "clearly delineate the proposed Site Plan and respective Parcels . . . to [R 150] for review and approval during the Study Period" and, second, once he had a "final approved Site Plan with Parcels 1, 2, and 3," he had to date it and attach it to the Option. (ECF No. 80-2, at 21.) Exhibit C would be legal descriptions of all three Parcels, and Cathcart would need to have those "delineated and identified in accordance to the final approved Exhibit B prior to the end of the Study Period." (*Id.* at 22.)

Plaintiffs have plausibly alleged that Cathcart met his first obligation as to Exhibit B. Cathcart circulated a proposed site plan to R 150 on March 27, 2019, followed by an updated version on October 25, 2019. (*See* ECF No. 80-4, at 3; ECF No. 80-6, at 4.) R 150 responded to Cathcart both times, requesting substantial changes to ensure the site plan was compatible with R 150's Master Development Plan in the second exchange. (*See* ECF No. 80-4, at 1; ECF No. 80-6, at 1.) R 150, then, had reviewed Cathcart's site plan twice before the parties signed the Second Amendment and ended the Study Period on November 22, 2019. (*See* ECF No.

80-7, at 3.) The following January, R 150 filed its Master Development Plan with the appropriate authorities. (ECF No. 80-9, at 2.) It notified Cathcart of the submission and proposed changes to Cathcart's site plan in the interim. (*Id.* at 1–2.) The court finds that these actions plausibly discharged Cathcart's first duty regarding Exhibit B.

As for Cathcart's second obligation related to Exhibit B and his obligations related to Exhibit C, R 150's failure to record its subdivision plat with the county has precluded him from obtaining his own final site plan to attach to the Option. (*See* ECF No. 90-5, at 1 (asking R 150 for the "[d]ate in which the plat will be recorded" because "we cannot obtain our site plan approval without it"); *see also* ECF No. 90-3, at 2 (advising R 150 to "work out ASAP the timing of the plat being recorded . . . to the satisfaction of the county so they will approve our site plan").) R 150 contacted Cathcart on December 22, 2020 announcing that it "stands ready to close on the sale of that certain tract of land which is more specifically described in the attached draft Deed and depicted on the attached and incorporated plat." (ECF No. 80-12, at 1.) Cathcart responded affirmatively the next day. (*See* ECF No. 80-13, at 2.) Indeed, Cathcart entreated R 150 at least eight times over the next 50 days to file R 150's proposed final subdivision plat with the appropriate authority, or to at least give Cathcart the date on which that filing would happen. (*See, e.g.*, ECF No. 80-13, at 2; ECF No. 80-17, at 1; ECF No. 80-18, at 2; *id.* at 1–2; *id.* at 1; ECF No. 90-5, at 1; ECF No. 90-3, at 2; ECF No. 80-19, at 2.)

In addition to needing R 150 to file the subdivision plat to file its site plan, Cathcart needed Exhibit B before he could create the legal descriptions required for Exhibit C. (*See* ECF No. 80-2, at 22 (explaining that the attached legal descriptions (Exhibit C) would "be delineated and identified in accordance to the final approved Exhibit B").) R 150 cannot

31

benefit from its own foot-dragging. "[I]f one party to a contract hinders, prevents or makes impossible performance by the other party, the latter's failure to perform will be excused." *Rastek*, 806 S.E.2d at 426 (quoting 13 Williston on Contracts § 39:3). Thus, Cathcart's failures to attach Exhibits B and C to the Option plausibly are excused because R 150's refusal to file a subdivision plat made Cathcart's performance impossible.

When this lawsuit began, both parties ostensibly had failed to complete certain conditions precedent required by the Option.  Plaintiffs have alleged both that R 150 refused to fulfill its own contractual duties prior to closing and that these refusals explain Cathcart's own purported failures. *See Rastek*, 806 S.E.2d at 425–30. The court finds these allegations plausible. Accordingly, specific performance is not barred by any of the conditions precedent that R 150 has asserted are unfulfilled.

Finally, R 150 argues that Plaintiffs cannot sue it for breach because it terminated the Option before they filed suit. (*See* Def.'s Resp. Opp'n Mot. Leave Amend at 23–25.) Because of that termination, R 150 argues that the parties were released from any further obligations to each other under the Option. (*Id.*; *see* ECF No. 80-2, at 8–9 ("[R 150] may terminate this Agreement . . . and the parties shall be released of any further obligations hereunder.").)

This argument fails because R 150's right to terminate had not vested when it attempted to terminate the contract. R 150 had no right to terminate the Option until "the applicable Settlement Date" had passed. (ECF No. 80-2, at 9). The Settlement Date was "the last day of the applicable Option Period" (*id.* at 6), and the parties' Third Amendment pushed the applicable Settlement Date back to March 31, 2021, (ECF No. 80-14, at 1). Yet R 150

purported to terminate the Option on February 12, 2021, more than a month before it had the right to do so. (*See* ECF No. 80-20, at 1–2.)

Even if the termination had been timely, a breaching party cannot avoid liability for its breach by preemptively ending a contract. "Every breach gives rise to a claim for damages, and may give rise to other remedies." Restatement (Second) of Contracts § 236 cmt. a; *see also Winmar, Inc. v. Al Jazeera Intern.*, 741 F. Supp. 2d 165, 178–80 (D.D.C. 2010) (rejecting defendant's argument that its termination of a contract in accordance with the contract's terms precluded plaintiff's claim for a material breach that occurred before the defendant's termination).

### vi.  Nature of Specific Performance

R 150's fourth argument is that the terms of any specific performance would be too indefinite to enforce. In other words, even if there were no dispute regarding Parcel 1's location, actually enforcing the Option would be too burdensome. (Def.'s Resp. Opp'n Mot. Leave Amend at 19–31.)

If appropriate, the court could order R 150 specifically to perform its outstanding contractual obligations to its best efforts. *See Cangiano*, 623 S.E.2d at 179–82. Most prominently, R 150 has a contractual duty to subdivide Parcel 1 from the remainder of its Property. (*See* ECF No. 80-2, at 5.) This task seems straightforward because the parties appear to have already agreed to a subdivision plat—which R 150 proposed—and which R 150 ostensibly could submit to affect the subdivision. (*See* ECF No. 80-12, at 53–56 (attaching a proposed subdivision plat); ECF No. 80-13, at 2 (describing the plat as "correct" and asking R 150 to "[p]lease proceed to obtain approval of the Subdivision Plat as soon as possible").)

Note, too, that whatever uncertainty the parties have now about Parcel 1's location might disappear with R 150's subdivision of the property.

Of course, other tasks might also remain outstanding. The Supreme Court of Virginia has made clear that the perceived impracticality of specific performance weighs against granting specific performance. *See Holtzman Oil Corp. v. Green Project, LLC*, No. 141863, 2016 WL 3208943, at \*4 (Va. Apr. 21, 2016); *see also* Restatement (Second) of Contracts § 366. On the face of the pleadings, R 150 still had to obtain approvals for water and sewer utilities and for the trail, as well as removing the stockpiles of dirt from the Property. (ECF No. 90-2, at 1.) So shepherding this real estate transaction along, as far as the court can tell, would not require the court to do much more than order specific performance of tasks that the parties had discussed at length and which R 150 routinely completes in its business dealings. *See Cangiano*, 623 S.E.2d at 181 (affirming award of specific performance even though completion of tasks using "best efforts" could cost as much as $850,000 and take as long as 18 months); *compare Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1090, 1093, 1104–07 (E.D. Va. 2011) (appointing a Special Master to oversee an eighteen-month construction project involving fifty-six acres). R 150 is a sophisticated entity, and its best efforts are likely to discharge these duties ably, if so ordered. *See Cangiano*, 623 S.E.2d at 179–82.

In appropriate circumstances, a court may deny specific performance "if it is impossible for the court to precisely define the specific actions to be performed." *Holtzman Oil*, 2016 WL 3208943, at \*4 (quoting *Perel v. Brannan*, 594 S.E.2d 899, 904 (2004)). At this stage, the court believes it could enter a short order directing R 150 to use its best efforts to resolve a limited

number of outstanding contractual duties, if appropriate after summary judgment and trial. Of course, as the parties undertake discovery, the court's impression could change.

*   *   *

In sum, after conducting two hearings and reviewing over 600 pages of exhibits and briefing relevant to the ripe issues, the court will grant Plaintiffs' leave to amend his complaint. This is not a determination of whether Plaintiffs' claim for specific performance will be meritorious, only that it is plausible on the face of the pleadings. *See Iqbal*, 556 U.S. at 678–79. Plaintiffs' motion for leave to amend (ECF No. 80) will be granted. Granting that motion moots R 150's motion to dismiss. *Young v. City of Mount Rainer*, 238 F.3d 567, 572–73 (4th Cir. 2001). Accordingly, R 150's motion to dismiss Plaintiffs' amended complaint (ECF No. 13) will be denied as moot. Defendant will file an answer addressing Plaintiffs' proposed second amended complaint, and the parties will proceed to discovery.

## C. *Lis Pendens*

R 150 moves this court to quash Reserve's memorandum of *lis pendens*. (ECF No. 45.) It argues that the filing was improper because it implicated more of R 150's land than necessary and caused R 150 to default on a commercial obligation. (Def.'s Br. Supp. Mot. Quash at 1–3 [ECF No. 46].) Plaintiffs respond that the filing needed to encumber all of R 150's land because the anticipated sale would include portions of both Tax Map Nos. 64-A-10 and 64-A-12. (Pls.' Resp. Opp'n Mot. Quash at 3 [ECF No. 55].) Further, although Tax Map No. 63-A-150 would not be part of the conveyance, Plaintiffs represent that "the Parties were still discussing access, utilities, easement, and dedication rights that could have affected this

parcel." (Pls.' Resp. Opp'n Mot. Sanctions at 12; *see also* Pls.' Resp. Opp'n Mot. Quash at 4 n.3.)

Reserve filed a memorandum of *lis pendens* in the Circuit Court of Albemarle County on the same day it filed its original complaint in this action. "The filing of the notice of *lis pendens* prevents a subsequent deed of trust or purchase of the property from affecting the plaintiff in the pending suit in any way." *Meliani v. Jade Dunn Loring Metro LLC*, 286 F. Supp. 2d 741, 745 (E.D. Va. 2003) (citation omitted). In other words, filing a memorandum of *lis pendens* ensures that "an interest in property acquired during the pendency of a litigation regarding that property is subject to the outcome of the litigation, provided the transferee or purchaser of the property receives notice of the pending lawsuit." *Id.* at 744; *see also Republic Servs. of Va., LLC v. Am. Timberland, LLC*, No. 6:06-CV-00041, 2006 WL 3421840, at *2 (W.D. Va. Nov. 28, 2006) ("The purpose of a lis pendens filing is to give notice to anyone who might purchase the land that pending litigation might affect the buyer's rights.").

Virginia prohibits the filing of a *lis pendens* "unless the action on which the *lis pendens* is based seeks to establish an interest by the filing party in the real property described in the memorandum." Va. Code Ann § 8.01-268 (emphasis added). A claim for specific performance of a contract conveying ownership of real property, then, can support a motion for *lis pendens*. *See Allen v. Lindstrom*, 379 S.E.2d 450, 452, 455 (Va. 1989) (entering judgment for specific performance of a contract for the sale of land to plaintiffs); *see also* 54 C.J.S. *Lis Pendens* § 10 (2021) ("A suit for specific performance is within the doctrine of lis pendens."). *Cf. Republic Servs.*, 2006 WL 3421840, at *2 (suggesting that "an option" on a piece of property would give a plaintiff a "conventional[]" interest in the property).

36

Under Virginia law a presiding court must notify the affected parties and the relevant county clerk that a *lis pendens* has been quashed when the cause of action sustaining the *lis pendens* has been dismissed. *See* Va. Code Ann. § 8.01-269.

Plaintiffs have introduced documents purporting to show an anticipated purchase of land including parts of both tracts. (*See* ECF No. 55-3 at 1; *id.* at 2; *cf. id.* at 3 (referencing a "remainder" of Tax Map No. 64-A-10); *id.* at 8 (referencing a "remainder" of Tax Map No. 64-A-12)). Moreover, Plaintiffs could not file a *lis pendens* specifically addressed to the anticipated conveyance because R 150 had not yet subdivided the to-be-conveyed Parcel from the existing Tax Map Nos. *See Bison Bldg. Co., LLC v. Brown*, No. 2005-1104, 2006 WL 1360893, at *7 (Va. Cir. Ct. Apr. 5, 2006). That's enough to sustain the *lis pendens* on those two parcels.

The third parcel—which accounts for 0.309 acres (approximately 0.21 percent of the Property)—presents a closer question. Can an interest in a potential easement sustain a *lis pendens*? The court concludes that it can in this instance and for purposes of a motion to dismiss. Plaintiffs have represented that the parties were engaged in active negotiations involving easements and other encumbrances on Tax Map No. 63-A-150. (*See* Pls.' Resp. Opp'n Mot. Sanctions at 12; Pls.' Resp. Opp'n Mot. Quash at 4 n.3.) A party's interest in an easement can sustain its filing of a *lis pendens*. *See, e.g.*, *Park 100 Inv. Grp. II, LC v. Ryan*, 103 Cal. Rptr. 3d 218, 224–26 (Cal. Ct. App. 2009); *Schwab v. City of Seattle*, 826 P.2d 1089, 1092–93 (Wash Ct. App. 1992); *see also* 54 C.J.S. *Lis Pendens* § 10. Although Plaintiffs' representation of these discussions is only weakly supported by the pleadings, the court concludes that it is sufficient to survive a motion to dismiss. (*See* ECF No. 80-2, at 12 (discussing necessary

easements for the Property's development, but not referencing Tax Map No. 63-A-150); ECF No. 80-19, at 11 (same); ECF No. 80-12, at 33–34 (same).)

As discussed above, Plaintiffs plausibly have alleged a claim for specific performance. At the pleadings stage, that claim sustains the *lis pendens* as to all three Tax Map Nos. Accordingly, R 150's motion to quash Plaintiffs' memorandum of *lis pendens* (ECF No. 45) will be denied.[7]

### D. Sanctions

Federal Rule of Civil Procedure 11(c) allows district courts to sanction parties that make court filings with an improper purpose or without evidentiary support, as well as for other reasons. R 150 moves the court to sanction Cathcart, Reserve, and their counsel for Reserve's filing of a memorandum of *lis pendens* in state court. (ECF No. 32.) R 150 claims that the filing was "not grounded in fact" and "for the improper purpose of encumbering [R 150's] property." (Def.'s Br. Supp. Mot. Sanctions at 2 [ECF No. 33] at 4–5.)

Neither argument has merit. First, "[a] complaint's factual allegations fail to meet the requirements of Rule 11(b)(3) when no corroborating information has been obtained before filing." *Myers v. Sessoms & Rogers, P.A.*, 781 F. Supp. 2d 264, 267 (E.D.N.C. 2011) (citing *Morris v. Wachovia Sec. Inc.*, 448 F.3d 268, 277 (4th Cir. 2006)). "[A] complaint containing allegations unsupported by *any* information obtained prior to filing, or allegations based on information which minimal factual inquiry would disprove, will subject the author to sanctions." *In re Kunstler*, 914 F.2d 505, 516 (4th Cir. 1990) (emphasis original).

---

[7] If appropriate, R 150 may move the court to quash Cathcart's memorandum of *lis pendens* in conjunction with a motion for summary judgment on Cathcart's claim for specific performance. Such a motion to quash plausibly could target all three Tax Map Nos., or just Tax Map No. 64-A-10.

Cathcart signed the Option. (*See* ECF No. 80-2, at 19.) His amended complaint attached the Option's three Amendments and pre-litigation correspondence between the parties. (*See* ECF Nos. 5-2, 5-3, 5-4, 5-8, 5-9.) This correspondence included minimally different potential locations for the conveyance. (*Compare*, ECF No. 55-1, at 55 (map dated October 28, 2020 showing a 16.125-acre parcel), *with* ECF. No. 55-2, at 2–4 (email dated August 4, 2020 attaching a map showing a 16.8-acre parcel), *and* ECF No. 55-3, at 1 (surveyor plat "draft submittal" dated March 27, 2018 showing a 16.5301-acre parcel).) Indeed, before filing the *lis pendens*, Cathcart wrote to R 150 asking it to abide by their contract. (ECF No. 80-19, at 13–14.) These documents gave Plaintiffs and their counsel a factual basis for which to both seek specific performance and file a *lis pendens*.

Second, the pleadings do not suggest that Plaintiffs' decision to supplement their complaint with a memorandum of *lis pendens* was done with an improper purpose. An improper purpose could be "to harass, cause unnecessary delay, or needlessly increase the cost of litigation," but this list is nonexclusive. *See* Fed. R. Civ. P. 11(b)(1). "If a complaint is not filed to vindicate rights in court, its purpose must be improper." *Kunstler*, 914 F.2d at 518.

Plaintiffs' complaint and memorandum of *lis pendens* seek specific performance of a contract that would ultimately convey to Cathcart "not more than 26.23 acres" within the Property's "approximately one hundred-fifty (150) acres." (ECF No. 80-2, at 1.) For the reasons explained above, the *lis pendens* will be sustained, insofar as Plaintiffs' have plausibly alleged specific performance. As such, the court concludes it was not filed for an improper purpose.

None of Plaintiffs' conduct in this litigation to-date rises to the level necessary for the court to impose sanctions. Accordingly, the court will not analyze Plaintiffs' argument that the party filing a *lis pendens* enjoys absolute immunity from sanctions related to that filing. (Pls.' Resp. Opp'n Mot. Sanctions, at 8–10); *see generally Givago Growth v. iTech AG, LLC*, 863 S.E.2d 684 (Va. 2021).

R 150's motion for sanctions (ECF No. 32) will be denied.

## IV.   CONCLUSION

Plaintiffs' motion for leave to amend their amended complaint (ECF No. 78) will be granted. R 150's motion to dismiss Plaintiffs' amended complaint (ECF No. 13) will be denied as moot. R 150's motion to quash Plaintiffs' memorandum of *lis pendens* (ECF No. 45) will be denied. And R 150's motion for sanctions (ECF No. 32) will be denied.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties and all counsel of record.

**ENTERED** this 7th day of February, 2022.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE