IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| THE RESERVE AT WINCHESTER I, LLC and ROBERT B. CATHCART, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3:21-cv-00008 |
| v. | ) ) | **MEMORANDUM OPINION** |
| R 150 SPE, LLC, | ) ) ) | By:   Hon. Thomas T. Cullen United States District Judge |
| Defendant. | ) | |

This case is before the court on Plaintiffs Robert B. Cathcart and The Reserve at Winchester I, LLC's ("Reserve") (collectively "Plaintiffs") motion to dismiss Defendant R 150 SPE LLC's ("R 150") amended counterclaim. (ECF No. 133.) For the reasons discussed below, the court will grant the motion in part and deny it in part.

## I.   BACKGROUND

R 150 owns approximately 150 acres of land in Frederick County, Virginia. (*See* Am. Countercl. ¶ 61 [ECF No. 129].)[1] That land is divided among three government subdivisions, each identified by a distinct tax map number: Tax Map No. 64-A-10 is 29.657 acres, Tax Map No. 63-A-150 is 0.309 acres, and Tax Map No. 64-A-12 is 120.384 acres. (*Id.*)

On August 9, 2017, the parties signed a Real Estate Purchase Option Agreement (the "Option"), which outlined the contours of a potential real-estate deal. (*See* ECF No. 129, at 21–39.) If the parties fulfilled certain enumerated obligations, Plaintiffs would be entitled to

---

[1] R 150's amended counterclaim is 105 pages long. This single document includes both the amended counterclaim itself and the documents attached as exhibits. This Memorandum Opinion will cite to the body of the amended counterclaim as "Am. Countercl. ¶ #" and to the attachments as "ECF No. 129, at #."

purchase up to 26.23 acres of R 150's land. (*Id.* at 21.) R 150 would convey that acreage to Plaintiffs in either two or three different Parcels. (*Id.* at 21–24.)

The terms of the prospective sale required Plaintiffs to deliver three separate documents to R 150 at the appropriate times. One of these documents was a "written notice of exercise" "on or before the" Option's expiration. (*Id.* at 24–25.) Plaintiffs were also required to give a "final approved Site Plan" (known as Exhibit B) and "the legal description of the 26.23 Acres to be subdivided into Parcels" (known as Exhibit C) to R 150 before closing on any given Parcel. (*Id.* at 25–26, 28–29, 41–42.)

The parties executed three Amendments to the Option. (*Id.* at 45–47 (First Amendment); *id.* at 48–50 (Second Amendment); *id.* at 51–60 (Third Amendment).) The Second Amendment memorialized the parties' intent to make the potential sale in two conveyances instead of three. (*See id.* at 50.) In other words, the parties would negotiate two sequential sales of land in order to complete Plaintiffs' purchase of up to 26.23 acres.

During negotiations over the Parcels' locations, Plaintiffs allegedly submitted conflicting site plans to R 150. (Am. Countercl. ¶ 20.) These documents showed "different structures and different boundaries," which, in turn, delayed negotiations. (*Id.*) Plaintiffs also allegedly put off seeking Frederick County's approval of their site plan. In an October 6, 2020 email, Plaintiffs told R 150 that they could not submit their third site plan to the County until they received additional comments from Frederick Water, a local utility company. (*Id.* ¶ 21; ECF No. 129, at 61.) R 150 alleges that this is inaccurate; instead, their agreement required Plaintiffs to submit their third site plan to the County at that time even without the utility company's comments. (Am. Countercl. ¶ 21.)

In addition to these delays in negotiations and correspondence, R 150 alleges that Plaintiffs also failed to perform at least three express contractual obligations: Plaintiffs never delivered a written Notice of Exercise to R 150, Plaintiffs never delivered Exhibit B to R 150, and Plaintiffs never delivered Exhibit C to R 150. (*Id.* ¶¶ 25–27.)

R 150 alleges that Plaintiffs intentionally failed to perform these obligations to force R 150 into agreeing to disadvantageous locations for the Parcels. On September 10, 2020, a Frederick County official informed the parties that "setbacks" would be required in between Parcel 1 and Parcel 2 if those Parcels were subject to different subdivision plats. (*Id.* ¶ 30; ECF No. 129, at 64.) Plaintiffs' initial response was to lament this news: "[T]his is going to require a complete re-design of our property and loss of a significant amount of units . . . . We are also going to have to have time to do the re-design, re-price everything, and [seek new financing]." (Am. Countercl. ¶¶ 32–33; ECF No. 129, at 65–66.)

But according to R 150, Plaintiffs soon resolved to force R 150 to convey Parcel 1 to them. The setbacks required for Parcel 1 would devalue the surrounding land, enabling Plaintiffs to purchase Parcel 2 at a significantly reduced price. (*See* Am. Countercl. ¶¶ 34–38.) R 150 attempted to negotiate boundaries for a single conveyance of both Parcels—which would have eliminated any internal setbacks—but Plaintiffs declined. (*Id.* ¶¶ 38, 40.)

While these conversations were ongoing, R 150's environmental consultant discovered wetlands at the parties' agreed access point to the property, which required the parties to renegotiate a new access point. (*Id.* ¶ 41.) The Third Amendment contained two provisions that governed such negotiations. The "Access Road Provision" required that, if Plaintiffs were "not able to access the Property via Crossover Boulevard," then the parties would "enter into

good[-]faith negotiations to enter into a separate easement agreement which shall provide for the location of a construction access connecting the Property across [R 150's] remaining property to [U.S Route] 522." (ECF No. 129, at 52.) And the "Shared Entrance Provision" required that, if Frederick County required "the installation of a complete entrance" to the property, then the parties "agree to enter into good[-]faith negotiations to enter into a separate agreement which shall provide for the design and construction of said shared entrance." (*Id.* at 52–53.) R 150 alleges that the discovery of the wetlands implicated both of these provisions, yet Plaintiffs demanded that R 150 sign their proposed Fourth Amendment instead of negotiating in good faith to resolve the lingering issues. (Am. Countercl. ¶ 48.)

R 150 also alleges that Plaintiffs repeatedly misrepresented that their financing was in jeopardy. (*Id.* ¶¶ 49–57.) These misrepresentations, R 150 asserts, were deliberate attempts by Plaintiffs to shirk their contractual responsibilities and induce R 150 to take on additional obligations. (*See id.* ¶ 57.)

Negotiations eventually reached a standstill, and on February 24, 2021, Plaintiffs filed this lawsuit against R 150. (*See* State Ct. R. at 1 [ECF No. 1-1].) In so doing, Plaintiffs asserted that R 150 had breached the option and that they were entitled to specific performance for the sale of Parcel 1. (*Id.* at 7.) R 150 denies that the parties ever agreed to that conveyance's location. (Am. Countercl. ¶ 79.) That same day, Plaintiffs filed a *lis pendens* naming Tax Map No. 64-A-10, Tax Map No. 63-A-150, and Tax Map No. 64-A-12. (*Id.* ¶¶ 60–61.)

In its amended counterclaim, R 150 has alleged slander of title, breach of contract, and breach of the covenant of good faith and fair dealing. Plaintiffs have moved to dismiss each of those claims. The court will grant in part and deny in part Plaintiffs' motion.

## II.    STANDARD OF REVIEW

A counterclaim is treated like any other claim, and when it is challenged under Federal Rule of Civil Procedure 12(b)(6) the same standards apply. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). Rule 12(b)(6) motions test a claim's legal sufficiency. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive such a motion, the claim "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While a claim does not need "detailed factual allegations," claims merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id*. (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557). Courts ruling on 12(b)(6) motions can consider exhibits attached to the counterclaim. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

## III.    ANALYSIS

### A.  Slander of Title; Absolute Privilege

"To state a valid claim for slander of title under Virginia law, a plaintiff must allege facts showing '(1) the uttering and publication of the slanderous words by the defendant, (2) the falsity of the words, (3) malice, (4) and special damages.'" *Allison v. Shapiro & Burson, LLP*,

No. 1:09CV00057, 2009 WL 4015410, at *7 (W.D. Va. Nov. 19, 2009) (quoting *Lodal v. Verizon Va., Inc.*, No. CL-2007-2178, 2007 WL 5984179, at *2 (Va. Cir. Ct. Aug. 22, 2007)). R 150 alleges that Plaintiffs' *lis pendens* has slandered its title to Tax Map Nos. 64-A-10, 63-A-150, and 64-A-12. Plaintiffs counter that their *lis pendens* is entitled to absolute privilege, and, in any event, R 150 has failed to state a claim for slander of title.

"[W]ords spoken or written in a judicial proceeding that are relevant and pertinent to the matter under inquiry are absolutely privileged from subsequent charges of defamation." *Givago Growth, LLC v. iTech AG, LLC*, 863 S.E.2d 684, 687 (Va. 2021) (internal quotation omitted). "[A]bsolute privilege is broad and comprehensive, including within its scope all proceedings of a judicial nature . . . ." *Id.* (internal quotation omitted). The privilege extends to a *lis pendens* that "merely republishes the key information" from the related lawsuit. *Id.* If "the information contained in the *lis pendens* [is] sufficiently relevant and pertinent to the matter under inquiry," then the privilege attaches. *Id.* at 688 (internal quotation omitted). Courts evaluate this connection using "a liberal rule." *Id.*

That liberal standard is met here. The Fairfax County Circuit Court's application of absolute privilege to a slander of title claim involving similar facts supports this conclusion. *See Bison Bldg. Co. v. Brown*, No. 2005-1104, 2006 WL 1360893, at *5–8 (Va. Cir. Ct. Apr. 5, 2006). In *Bison Building*, a developer purchased 6.2-acres of land which it intended to subdivide into four individual lots. *Id.* at *1. One of these lots, Lot 1, was sold before the subdivisions had been recorded with the county. *Id.* at *1–2. The buyer filed a *lis pendens* against the entire 6.2 acres in an effort to accelerate the closing. *See id.* at *2. Once the developer recorded the subdivisions, the buyer modified his *lis pendens* to clarify that he sought an interest only in Lot

1. *Id.* at *3. The deal eventually fell apart for other reasons, and the developer sued the buyer for slander of title, arguing that the filing prevented it from closing a sale on Lot 4. *Id.* at *1, 3.

The critical question before the court was whether or not absolute privilege applied to the buyer's *lis pendens*. The court reasoned that the privilege applied to the challenged *lis pendens* because "a memorandum of *lis pendens* can do no more than recite what is already contained in the pending litigation." *Id.* at *7. In the absence of a specific subdivision for Lot 1 at the time of his filing, the buyer "could only have indexed his *lis pendens* with reference to the entire [6.2-acre] property." *Id.*; *see also* Va. Code Ann. § 8.01-268(A) (stating that an improperly indexed *lis pendens* is ineffective). The court noted that after the defendant had properly subdivided the 6.2 acres, the buyer amended his *lis pendens* to cover only Lot 1, which supported a finding of absolute privilege. *Bison Bldg.*, 2006 WL 1360893, at *3.

As in Bison Building, the *lis pendens* in this case is necessarily overbroad. Only a properly indexed *lis pendens* is valid, and Bison Building suggests that a *lis pendens* can only be indexed to a recognized government subdivision of land. *See* Va. Code Ann. § 8.01-268(A); *Bison Bldg.*, 2006 WL 1360893, at *7 (citing Va. Code Ann. § 15.2-2254). The document itself directs interested parties to review the record in this case for additional detail. (*See* ECF No. 29, at 10–13); *see also Motley v. Vicello*, 111 S.E. 295, 299 (Va. 1922) ("The [property] must be so described in the pleadings as to be capable of identification by the purchaser, had he known of and examined the record of the suit."). That record displays Plaintiffs' plausible identification of the Phase 1 Parcel. *See Rsrv. at Winchester I, LLC v. R 150 SPE*, No. 3:21-cv-8,

2022 WL 358500, at *10–11 (W.D. Va. Feb. 7, 2022) ("*Reserve I*"); *Rsrv. at Winchester I, LLC v. R 150 SPE*, No. 3:21-cv-8, 2022 WL 822208, at *1–3 (W.D. Va. Mar. 17, 2022) ("*Reserve II*").

In sum, the *lis pendens* only provides notice of Plaintiffs' claims as outlined in the record of this case. It is not a lien—it has no legal effect except as a notice "to warn others that rights which they may acquire will be subject to any valid judgment entered." *Bray v. Landergren*, 172 S.E. 252, 256–57 (Va. 1934); s*ee Harris v. Lipson*, 189 S.E. 349, 352 (Va. 1937). And until a more specific subdivision has been filed with the local government, Plaintiffs' *lis pendens* cannot be indexed to a more accurate representation of the land at issue. *See Bison Bldg.*, 2006 WL 1360893, at *7. Accordingly, Reserve's *lis pendens* is entitled to absolute privilege because the three named Tax Map Nos. are "sufficiently relevant and pertinent to the matter under inquiry." *Givago Growth*, 863 S.E.2d at 688 (internal quotation omitted).

The court further concludes that the *lis pendens* is not "so palpably wanting in relation to the subject matter of the controversy that no reasonable man can doubt its irrelevancy and impropriety" (such that it would be ineligible for absolute privilege). *Givago Growth*, 863 S.E.2d at 688 (quotation omitted). The Supreme Court of Virginia has found this standard met where the party filing the *lis pendens* had no purported interest in any portion of the named land. *Id.* at 685–86, 688.

This case is nothing like that. The property named in the *lis pendens* is named in the Option, it includes and surrounds the conveyance plausibly identified by the parties' Amendments and communications, and even the portions not directly implicated are otherwise subject to easements or utilities that may accompany a resulting conveyance. *See Reserve I*, 2022 WL 358500, at *1, 10–11, 18. Additionally, the filing party in *Givago Growth* had

no potential ownership interest in the land it identified—here, the *lis pendens* was filed by Reserve, an intended third-party beneficiary to the Option. *Compare Givago Growth*, 863 S.E.2d at 685 n.1, *with Reserve I*, 2022 WL 358500, at *5–6. Such a *lis pendens* is eligible for absolute privilege.

Accordingly, this case is one of "the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the [counterclaim.]" *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc). As such, the court will grant Plaintiffs' motion to dismiss R 150's slander of title claim under Rule 12(b)(6), and R 150's slander of title claim will be dismissed. *See Mansfield v. Bernabei*, 727 S.E.2d 69, 71–72, 75 (Va. 2012) (affirming grant of demurrer applying absolute privilege to defamation claims); *Titan Am., LLC v. Riverton Inv. Corp.*, 569 S.E.2d 57, 64, 66 (Va. 2002) (same).

### B. Breach of Contract; Express Breach; Breach of the Covenant of Good Faith and Fair Dealing

In Virginia, breach of contract requires: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016) (cleaned up). There are several different ways that a party can breach a contract. *See Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 611–12 & n.5 (4th Cir. 2021) (applying Virginia law and analyzing three different theories of breach of contract: express material breach, breach of the implied covenant of good faith and fair dealing, and prevention). R 150 pleads two counts of breach of contract. (Am. Countercl.

¶¶ 78–90.) Its first theory of breach is breach of express terms; the second theory of breach is breach of the implied covenant of good faith and fair dealing.[2]

Plaintiffs do not challenge that R 150 has failed to state a claim for breach of contract. Rather, they contend that R 150 has failed to perform a condition precedent to its suit for breach and that Virginia does not recognize a cause of action for breaches of the covenant of good faith and fair dealing in non-UCC contracts.

First, Plaintiffs argue that the Option included a condition precedent, which required R 150 to provide Plaintiffs with 15 days' written notice before R 150 could sue them for breach.[3] R 150 never provided such notice. And so Plaintiffs argue that R 150 cannot maintain its breach of contract claims because it failed to satisfy this condition precedent. *See Lerner v. Gudelsky Co.*, 334 S.E.2d 579, 584 (Va. 1985) ("A party seeking to recover on a contract right must allege and prove performance of any express conditions precedent upon which his right of recovery depends.").

This argument fails. The relevant contract provision reads: "If [Plaintiffs have] breached or [are] unable to perform any of [their] agreements, covenants and obligations hereunder within fifteen (15) days after written notice from [R 150], then, in any such event,

---

[2] The court advises both parties that it has already concluded that the Option is a contract under which both parties have certain obligations to each other regardless of whether they ultimately agreed to a sale of land. *See Reserve I*, 2022 WL 358500, at *3–5. This court *has not* concluded that the Option is a contract for the sale of land plausibly identified by the Third Amendment and the documents referenced therein. It has only determined that this conclusion is plausible based on Plaintiffs' second amended complaint. *Id.* at *10–11; *Reserve II*, 2022 WL 822208, at *1–3.

[3] Plaintiffs also argue that R 150 has no damages because the company still possesses the Monthly Option Fees that it attempted to pay Plaintiffs to terminate the Option because Plaintiffs never cashed the relevant check. (Pls.' Reply Br. Supp. Mot. Dismiss Am. Countercl. at 15 [ECF No. 141].) This argument is waived, however, because it was raised for the first time on reply. *See Epperson v. Payne*, No. 4:16-cv-00050, 2017 WL 1194715, at *9 (W.D. Va. Mar. 30, 2017).

[R 150] shall retain any and all Monthly Options Fees then held by [R 150] as full and complete liquidated damages[.]" (ECF 129, at 34.) The key question, then, is whether R 150 must give Plaintiffs 15 days' written notice after both Plaintiffs' breach *and* inability to perform, or only to their inability to perform.

The rule of the last antecedent makes clear that this condition precedent only applies to Plaintiffs' inability to perform. "[R]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence." *Butler v. Fairfax Cnty. Sch. Bd.*, 780 S.E.2d 277, 280 (Va. 2015). Here, it does not make sense to read the 15-day notice requirement back onto breaches; it is not clear how Plaintiffs could "breach[] . . . within fifteen (15) days after written notice from Seller." (ECF No. 129, at 34.) Rather, it is more likely that the parties intended Plaintiffs to have 15 days after the receipt of written notice "to perform any of its agreements, covenants and obligations," which they had failed to perform by that point "within fifteen (15) days after written notice from Seller." (*See id.*) Accordingly, the requirement for 15 days' written notice is not a condition precedent to a lawsuit for breach of contract.

Plaintiffs' second and final argument is that Virginia does not recognize a covenant of good faith and fair dealing in non-UCC contracts. Admittedly, there is some confusion on this question. *Compare Perez v. Cenlar*, No. CL19-10130, 2022 WL 1185378, at *5–6 (Va. Cir. Ct. Apr. 19, 2022) (collecting federal and Virginia cases holding that Virginia does not recognize a covenant of good faith and fair dealing in non-UCC contracts), *with Drummond Coal*, 3 F.4th

at 611–12 (holding the opposite), *and Wolf v. Fed. Nat'l Mortg. Ass'n*, 512 F. App'x 336, 344–45 (4th Cir. 2013) (per curiam) (same).

But the Supreme Court of Virginia suffers no such confusion. It unequivocally recognizes that a breach of the implied covenant of good faith and fair dealing in a non-UCC contract gives rise to a breach of contract claim. *See Levine v. Selective Ins. Co. of Am.*, 462 S.E.2d 81, 84 (Va. 1995) (reversing grant of summary judgment and "hold[ing] that the plaintiffs pled sufficient facts to support their action for breach of contract based on [defendant's] alleged breach of its covenant of good faith and fair dealing"); *see also Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997) (describing, in dicta, the implied covenant of good faith and fair dealing under the common law). This makes Virginia decidedly unexceptional. *See* Restatement (Second) of Contracts § 205 (Am. L. Inst. 1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."); *see also* 23 Williston on Contracts § 63:22 (4th ed. 2022); 17B C.J.S. *Contracts* § 671 (2022).

In short, Virginia recognizes an implied covenant of good faith and fair dealing in every contract. Breach of that covenant gives rise to a cause of action. R 150 has plausibly alleged that Plaintiffs violated this covenant, and the company is entitled to take discovery of this theory of breach.

In sum, R 150 has stated two alternative claims for breach of contract, and it has not failed to satisfy any condition precedent for bringing a counterclaim against Plaintiffs. As a result, R 150's breach of contract claims will proceed.

## C. Remedies

The parties dispute the remedy to which R 150 would be entitled if it proves its breach of contract claim. The Option's plain language states: "If [Plaintiffs have] breached . . . then, in any such event, [R 150] shall retain any and all Monthly Options Fees then held by [R 150] as full and complete liquidated damages[.]" (ECF No. 129, at 34.) R 150 argues that this provision is unenforceable, in part because Plaintiffs' breach has caused it $20,000,000 in damages. Plaintiffs urge the court to enforce this provision and limit R 150's contract damages to the Monthly Option Fees.

Generally, it is inappropriate for a court to foreclose certain remedies at the pleadings stage. *See* Fed. R. Civ. P. 54(c) (noting that most "final judgment[s] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"); *Bocock v. Specialized Youth Servs. of Va., Inc.*, No. 5:14cv00050, 2015 WL 1611387, at *2–4 (W.D. Va. Apr. 10, 2015) (explaining that Rule 12(b)(6) facilitates the dismissal of claims, not remedies). This case is no exception, and the court will not limit R150's potential recovery to the Monthly Option Fees—at least at this *early* stage.

## IV.   CONCLUSION

For the reasons discussed above, Plaintiffs' motion to dismiss R 150's amended counterclaim (ECF No. 133) will be granted in part and denied in part.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 15th day of June, 2022.

*/s/ Thomas T. Cullen*

HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE