IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| The Reserve at Winchester I, LLC et al., | ) | |
|     Plaintiffs, | ) | Civil Action No. 3:21cv00008 |
| | ) | |
| v. | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| R 150 SPE, LLC, | ) | By:   Joel C. Hoppe |
|     Defendant. | ) |        United States Magistrate Judge |

This matter is before the Court on Defendant R 150 SPE, LLC's Motion for a Protective

Order, ECF No. 64, and Plaintiffs The Reserve at Winchester I, LLC ("The Reserve") and

Robert Cathcart's (collectively, "Plaintiffs") Motion to Compel, ECF No. 69. For the following

reasons, Defendant's motion for a protective order is hereby **GRANTED** in part and **DENIED**

in part, and Plaintiffs' motion to compel is hereby **GRANTED** in part and **DENIED** in part.

I. Background

Plaintiffs initially filed this action in the Circuit Court for Albemarle County, Virginia,

*see* ECF No. 1, and Defendant removed it to this Court on March 16, 2021, *id.* In their

Complaint, Plaintiffs alleged that Defendant breached an agreement (the "Agreement") in which

Defendant agreed to sell Cathcart a roughly twenty-six-acre portion (the "Sale Property") of a

150-acre parcel (the "Project Property").[1] Plaintiffs additionally filed a Memorandum of *Lis*

*Pendens* on the entire Project Property. *See* ECF Nos. 45, 103. On February 7, 2022, Plaintiffs

filed a Second Amended Complaint in this action. ECF No. 127. On April 13, 2022, Defendant

filed an Amended Counterclaim against Plaintiffs. ECF No. 129.

---

[1] For purposes of this Order, "Project Property" refers to the whole of the 150-acre parcel owned by
Defendant, referred to in the Agreement, *see* Second Am. Compl. Ex. A, ECF No. 127-1, at 20, known as
Tax Map Reference Nos. 64-A-10, 64-A-12, and 63-A-150 located in Frederick, Virginia. The "Sale
Property" refers only to the roughly twenty-six-acre portion of the Project Property that Defendant
allegedly agreed to sell to Plaintiffs.

A.   *Second Amended Complaint's Allegations*

Plaintiffs allege that Cathcart and Defendant entered into the Agreement on August 9, 2017, Second Am. Compl. ¶ 13, and that the Agreement contemplated the Sale Property would be used as a multi-family development, *id.* ¶ 14. The Agreement provided for a "Study Period," that required Cathcart to pay a non-refundable fee of $7,500 to secure rights to study the Sale Property for 120 days, *id.* ¶ 15, and the parties contemplated that Cathcart would have the right to purchase the Sale Property by a certain date (the "Option Period"), *id.* ¶ 16. Under Section I of the Agreement, Defendant anticipated preparing and providing a boundary during the Study Period that identified which portion of the Project Property would make up the Sale Property, *id.* ¶ 18, and on March 27, 2019, Defendant emailed Cathcart a proposed subdivision plat prepared by Defendant's surveyor, Marsh & Legge Land Surveyors, P.L.C. ("Marsh & Legge"), depicting the size and location of the Sale Property, *id.* ¶ 19; *see also* Second Am. Compl. Ex. C, ECF No. 127-3.

During the Option Period, however, Defendant "recorded a Deed of Dedication and a Deed of Easements on the Sale Property in breach of the Agreement." Second Am. Compl. ¶ 17 (cleaned up). Defendant did not notify Cathcart that it had recorded these instruments. *Id.* Subsequently, around July 24, 2019, the parties executed a First Amendment to the Agreement, which extended the Study Period. *Id.* ¶ 20. During the extended Study Period, on October 25, 2019, Cathcart emailed Defendant a conceptual site plan (the "Conceptual Site Plan") pursuant to Section I and Exhibit B of the Agreement, and on October 30, Defendant emailed Cathcart "its general agreement to the Conceptual Site Plan." *Id.* ¶ 21. The Conceptual Site Plan depicted the Sale Property as lying within Tax Map Parcels 64-A-10 and 64-A-12. *Id.* ¶ 22. On November 22, the parties executed a Second Amendment to the Agreement, which "terminated the Study

Period, confirmed that the [Sale Property] would be purchased in two phases," and required Cathcart to close on the purchase of the "Phase One" portion of Sale Property by December 31, 2020. *Id.* ¶ 23.

On December 9, 2019, Cathcart sent Defendant a letter asking about dirt that Defendant "had allowed to be stockpiled" on the Sale Property and any changes to Cathcart's site plans that might result from Defendant's "Master Development Plan" for the Project Property. *Id.* ¶ 24. On February 13, 2020, Defendant responded, requesting that Cathcart ensure the final site plan "match and tie into" Defendant's "Master Development Plan." *Id.* ¶ 25.

In February 2020, Cathcart formed The Reserve as a special purpose entity to purchase the Sale Property. *Id.* ¶ 26. Although Cathcart "proceeded diligently" to fulfill his obligations and proceed to closing on the Phase One portion of the Sale Property, *id.* ¶ 27, Defendant's "lack of communication, cooperation, and progress in fulfilling its obligations under the Agreement obstructed the Parties' path to closing in almost all respect and all times," *id.* ¶ 28. Defendant, acknowledging its lack of progress, changed its representative from Tim Tarrant to Benjamin Wullschlager, both of whom worked for Hunt Companies. *Id.* During this time, again without Cathcart's knowledge, Defendant "was recording a deed of trust and corresponding assignments of rents securing a $10M loan on June 1, 2020." *Id.* ¶ 29.

By October 22, the parties "had refined the boundaries of the [Sale Property] and the number of units to be developed therein," *id.* ¶ 30, and on December 22, Wullschlager emailed Cathcart confirming the terms of the Agreement and expressing that Defendant was ready to close on the Phase One sale, *id.* ¶ 31. In the email, Wullschlager "specifically described the Phase One Property in a deed," which referenced a subdivision plat (the "Subdivision Plat") drafted by Marsh & Legge that "specifically identified the 16.125 acres of [p]roperty that

3

[Plaintiffs] would purchase under Phase One of the Agreement." *Id.* ¶ 32. Cathcart responded, "the Subdivision Plat attached to the Wullschlager Email is correct. Please proceed to obtain approval of the Subdivision Plat as soon as possible." *Id.* ¶ 34.

In anticipation of closing on Phase One, Cathcart assigned his rights under the Agreement to The Reserve. *Id.* ¶ 35. Despite Defendant's "representations that it stood ready to close on the Phase One Property by December 31, 2020, as required by the Second Amendment, [Defendant] failed and refused to do so." *Id.* ¶ 36. At Defendant's request, the parties agreed to extend the Phase One settlement date to March 31, 2021, as stated in a Third Amendment to the Agreement that was executed on December 31, 2020, *id.* ¶ 37. The Third Amendment references an "April 30, 2020 Site Plan with a[] November 20, 2020 revision date" (the "Site Plan"), that Plaintiffs had developed pursuant to their obligations under the Agreement, *id.* ¶ 38, and which was developed after extensive negotiations between the parties, *id.* ¶ 39. The Site Plan "specifically references and identifies the Phase One Property that Cathcart agreed to purchase under the Agreement, consistent with the Wullschlager Email and the prior versions of the boundary exhibits." *Id.* ¶ 40.

On January 15, 2021, Defendant agreed via email to record the Subdivision Plat, *id.* ¶ 41, but Defendant "and its counsel ceased communications with Cathcart and its counsel," *id.* ¶ 42. Through the date of filing this lawsuit, Plaintiffs paid Defendant the Monthly Option Fee for the Sale Property as required by the Agreement, complied with their obligations under the Agreement, and incurred over one million dollars in costs and fees in furtherance of their performance. *Id.* ¶¶ 43, 44.

Plaintiffs allege that Defendant breached the Agreement in several ways, including: (1) intentionally and wrongfully encumbering the Sale Property by recording the Deed of

Dedication, the Deed of Easements, and the Deed of Trust without notifying Plaintiffs and

without their consent, in violation of Sections 4 and 11 of the Agreement; (2) failing to obtain the

applicable approvals and to record the Subdivision Plat, thereby preventing Plaintiffs from

completing the review of the title contemplated by Section 11 of the Agreement; (3) stockpiling

dirt on the Sale Property in violation of Section 17(c) of the Agreement and failing to remove it

on Plaintiffs' request; (4) failing to prepare the design and to obtain County approval for a ten

foot asphalt trail by January 29, 2021, as set forth in the "Proffer Statement," and refusing

Plaintiffs' requests for information related to the trail; and (5) refusing to negotiate in good faith

alternative access to the Sale Property after Defendant "asserted that 'wetlands' made access to

Crossover Boulevard unfeasible." *Id.* ¶ 45.

       Plaintiffs provided Defendant notices of these breaches, but they did not receive a

response regarding how Defendant planned to cure them before the Settlement Date. *Id.* ¶ 47. On

February 10, 2021, Plaintiffs notified Defendant that they would initiate litigation, seeking

specific performance of the Agreement, if Defendant did not cure the breaches within thirty days.

*Id.* ¶ 51. Plaintiffs also proposed a fourth amendment to the Agreement, which would give

Defendant time to cure its breaches, but Defendant rejected that proposal. *Id.* ¶ 52. On February

12, Defendant responded to Plaintiffs, "asserting that [Defendant] could 'terminate' the

Agreement based on its own failure to meet its conditions with respect to the" Sale Property,

under Section 13 of the Agreement. *Id.* ¶¶ 53, 54 (citing Second Am. Compl. Ex. R, ECF No.

127-18). Defendant's letter also states that the "Agreement is hereby terminated" pursuant to that

section. Second Am. Compl. Ex. R. Section 13, however, provided Defendant the right to

terminate the contract only "[i]n the event any of the conditions ha[d] not been satisfied by the

applicable Settlement Date," Second Am. Compl. ¶ 54, and the Agreement defined the

Settlement Date as March 31, 2021, *id.* ¶ 55. Thus, Plaintiffs allege that Defendant "breached the Agreement before it could have claimed any right to terminate under Section 13" of the Agreement, and Defendant's purported termination of the Agreement was not effective. *Id.* ¶¶ 55, 56. Defendant's attempts to unilaterally terminate the contract constituted another breach. *See id.* ¶¶ 53–59.

Plaintiffs filed suit on February 24, 2021. *Id.* ¶ 57; *see also* ECF No. 1. On March 28, Defendant mailed Plaintiffs a check for $59,500.00, "which represent[ed] the total of the Option Fees paid by Cathcart" to Defendant, and Defendant "again confirm[ed] the [] Agreement [was] terminated." Second Am. Compl. ¶ 58. Plaintiffs subsequently amended the Complaint to add a claim for breach of contract. *Id.* ¶ 59. Defendant asserted that "the boundaries were never negotiated between the Parties," and that "the 26.23 acres [i.e., the Sale Property] would have been part of just one of the tax map tracts owned by Defendant." *Id.* ¶ 60. Plaintiffs then filed a Second Amended Complaint, ECF No. 127, "to correct these representations and identify the express statements of [Defendant] and its counsel as parties to the negotiation of the boundaries," and to provide "documents reflecting the [Sale Property's] bounds in the two largest tax parcels referenced in the Agreement," Second Am. Compl. ¶ 60. In their Second Amended Complaint, Plaintiffs assert a claim for specific performance of the Agreement, *id.* ¶¶ 61–80, or, alternatively, for damages stemming from the breach of contract, *id.* ¶¶ 81–89.

B.    *Defendant's Counterclaim*

On April 13, 2022, Defendant filed an Amended Counterclaim against Plaintiffs, which asserted the following allegations. Am. Countercl., ECF No. 129. The parties executed the Agreement in August 2017, *id.* ¶ 6, agreeing that they "would proceed to negotiate for the potential purchase of an undefined parcel(s) comprising not more than 26.23 acres," *id.* ¶ 7. The

Agreement required Cathcart to execute a Notice of Exercise before any property would be transferred, *id.* ¶ 8, and to concurrently deliver Exhibits B and C to the Agreement, showing the legal description of the Sale Property, *id.* ¶ 9. Further, Cathcart was required to "clearly delineate the proposed Site Plan" to Defendants "for review and approval during the Study Period . . . ," *id.* ¶ 10, and to "diligently pursue the requisite site plan and submit site plans consistent with, and responsive to, Frederick County, Virginia's comments for approval," *id.* ¶ 19 (cleaned up).

"Instead, [Plaintiffs] submitted different versions of site plans . . . depicting different structures and different boundaries[,] causing undue delay [and] frustrating negotiations[.]" *Id.* ¶ 20. Defendant believes that "Plaintiffs' actions were an exercise of contractual discretion in bad faith." *Id.* Plaintiffs "intentionally delayed the approval of a site plan with the County . . . and misrepresented their reasons for doing so," *id.* ¶ 21, and "failed to address and respond to" Frederick County's comments on the site plan or make the necessary corrections to the site plan, *id.* ¶ 22. Plaintiffs also never delivered Exhibits B and C concurrently, *id.* ¶ 23, nor did they ever "clearly delineate" the site plan, *id.* ¶¶ 24–25, or the legal descriptions of the parcels, *id.* ¶ 26, all of which Plaintiffs were obligated to do by the terms of the Agreement.

Additionally, Plaintiffs never exercised their option under the Agreement, ignored county setback requirements, and promoted boundaries that would devalue the remainder of the Project Property. *Id.* ¶¶ 27, 28. Specifically, the County informed Plaintiffs that their proposed site plan would require setbacks. *Id.* ¶ 32. Setbacks would not be required, however, if the Phase One and Phase Two developments were located on the same tax parcel. *Id.* ¶ 34. Thus, Plaintiffs knew that by closing only on the Phase One property, Tax Map Parcel 64-A-12 would be divided into two tax parcels, which would require setbacks for the developments and "substantially" decrease the value of the parcel, *id.* ¶ 36. Nonetheless, Plaintiffs represented that their Phase Two design

would still be viable with a boundary line adjustment, and Defendant relied on this representation while negotiating the Phase One boundaries. *Id.* ¶ 37.

Because Plaintiffs failed to "define and close" on Phase Two, however, "setbacks would be required on both the potential Phase [One] Parcel and the remainder of 64-A-12"; thus, "if a sale were finalized, [Defendant's] remaining property would have substantially decreased value as a result of setbacks from the new property line." *Id.* ¶ 38. Plaintiffs intentionally promoted such boundaries despite knowing of the setbacks "to cause a portion of [Defendant's] property to be devalued or unbuildable," in an effort to "force [Defendant] to sell the remainder of its property to Plaintiffs at a deeply discounted price." *Id.* ¶ 40.

Additionally, the Third Amendment to the Agreement provided that if Plaintiffs were unable to access the Sale Property via Crossover Boulevard, the parties would negotiate in good faith for a separate easement agreement for an alternative construction route connecting the Sale Property and the Project Property. *Id.* ¶¶ 16, 45. Additionally, in January 2021, Defendant's environmental consultant discovered wetlands at the agreed-upon access point, necessitating further negotiations. *Id.* ¶ 41. Nonetheless, Plaintiffs refused to engage in good faith negotiations, instead giving Defendant five days to sign a proposed fourth amendment to the Agreement or face litigation. *Id.* ¶ 44. For example, rather than hiring Perry Engineering, the contractor for Crossover Boulevard, "to easily provide a more than adequate construction entrance, Plaintiffs, on multiple occasions, demanded that [Defendant] provide an unnecessary, separate construction entrance to frustrate negotiations and cause further delay." *Id.* ¶ 46.

Further, the Agreement required the parties to negotiate in good faith for a separate agreement to provide for the design and construction of a "shared entrance from Crossover Boulevard into the Property and to provide access to [Defendant's] commercial property." *Id.* ¶

Case 3:21-cv-00008-TTC-JCH   Document 167   Filed 09/29/22   Page 9 of 24   Pageid#: 2954

17. Plaintiffs, however, again refused to negotiate in good faith and instead threatened litigation if Defendant did not agree to execute a fourth amendment to the Agreement. *Id.* ¶ 48.

Additionally, Plaintiffs on multiple occasions misrepresented that their financing was in jeopardy or that they were unable to secure financing, causing further delays. *Id.* ¶ 49. For example, on May 5, 2020, Plaintiffs emailed Defendant that they were "increasingly concerned" about their financing options, and they expressed that the closing date would need to be extended. *Id.* ¶ 50. On November 3, Plaintiffs emailed Defendant that the bank had expressed concern over financing the project because of "the lack of access to the site and the fact that [Plaintiffs] ha[d] back tracked on the timeline" they initially provided to the bank. *Id.* ¶ 52. Plaintiffs' financing, however, was never in jeopardy, *see id*. ¶¶ 54–56, and Plaintiffs made these misrepresentations "to leverage [Defendant] into exceeding its contractual obligation to the benefit of Plaintiffs and detriment to [Defendant]," and they "attempted to pressure [Defendant] into building an unnecessary road, extending the option period, and building over the wetlands," *id.* ¶ 57. Alternatively, Plaintiffs were unable to obtain financing and thus were unable to close on the Sale Property. *Id.* ¶ 58.

Based on these alleged breaches, Defendant asserts claims for breach of contract, *id.* ¶¶ 78–86, and breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 87–90.[2]

C.     *Defendant's Motion for Protective Order & Plaintiffs' Motion to Compel*

On October 1, 2021, Plaintiff propounded interrogatories and requests for production of documents on Defendant. *See* ECF No. 74-2, at 1–24. Defendant filed the instant motion for a protective order, requesting that nearly all discovery requests be limited or stricken altogether. ECF No. 64. Plaintiffs filed the instant motion to compel, requesting that the Court compel

---

[2] Defendants also asserted a claim for slander of title based on the theory that Plaintiffs had wrongfully filed a Memorandum of *Lis Pendens* on the entire Project Property, rather than just a portion of it. Am. Countercl. ¶¶ 70–77. That count was dismissed. *See* ECF Nos. 102–03.

Defendant's responses to the outstanding requests. ECF No. 69. After the parties submitted a status report on these and several other discovery disputes, ECF No. 146, the Court held a hearing, ECF No. 154. The motions are fully briefed, ECF Nos. 65, 70, 74, 79, 84, including supplemental filings, ECF Nos. 159, 161.

## II. Legal Standard

Broad discovery is generally permitted in civil cases. *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). "Relevance is not, on its own, a high bar." *Va. Dep't of Corrs. v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019). Indeed, "[t]here may be a mountain of documents and [other materials] that are relevant in some way to the parties' dispute, even though much of it is uninteresting or cumulative." *Id.* Moreover, information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). But discovery, "like all matters of procedure, has ultimate and necessary boundaries." *Hickman*, 329 U.S. at 507. As relevant here, courts must limit the frequency or extent of proposed discovery if it is "outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii).

Rule 26(c) allows a "party . . . from whom discovery is sought [to] move for a protective order in the court where the action is pending," and "[t]he court may, for good cause, issue an order to protect a party . . . from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Fed. R. Civ. P 26(c)(1). Additionally, a requesting party may file a motion to compel if another party fails to respond to or produce requested discovery. Fed. R. Civ. P. 37(a)(1). On such a motion, the party "resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *Eramo v. Rolling Stone LLC*, 314 F.R.D. 205, 209

(W.D. Va. 2016). Thus, once the moving party has made "a prima facie showing of discoverability," the resisting party has the burden of showing either: (1) that the discovery sought is not relevant within the meaning of Rule 26(b)(1); or (2) that the discovery sought "is of such marginal relevance that the potential harm . . . would outweigh the ordinary presumption of broad discovery." *Id.* (internal quotation marks omitted). Moreover, "District courts generally have broad discretion in managing discovery, including whether to grant or deny a motion to compel." *Id.* (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va.*, 43 F.3d 922, 929 (4th Cir. 1995)).

## III. Discussion

The parties' dual motions concern the same requests from Plaintiffs' First Set of Interrogatories and Plaintiffs' First Set of Requests for Production of Documents ("RFPs"). While Plaintiffs assert that these requests seek relevant materials and are proportional to the needs of the case, Defendant raises a wide range of objections to nearly all of them.[3] Throughout its brief, Defendant broadly challenges the relevancy of certain requests, Def.'s Br. 6, 8, ECF No. 65, and generally asserts that several requests are overbroad, *id.* at 4–5, 9.

To the extent Defendant raises specific objections, however, Defendant asserts that Plaintiffs' use of the term "Property" in many of the requests is ambiguous and that the requests using that term are overbroad or seek irrelevant information. *Id.* at 11–12, Further, Defendant contends that it cannot respond to Plaintiffs' discovery requests that use "Cathcart" to refer collectively to both Robert Cathcart and The Reserve. *Id.* at 13. Defendant also argues that many

---

[3] At the time of briefing, Defendant had not produced any materials responsive to any of Plaintiffs' requests for production. Pls.' Br. 2, ECF No. 70. At the hearing, however, counsel for Plaintiffs represented that Defendant's counsel had provided Plaintiffs with approximately 4,000 pages of documents that morning. In supplemental briefing, Plaintiffs assert that Defendant's production was inadequate. ECF No. 159.

requests are an effort to offset litigation costs by having Defendant compile information equally available to Plaintiffs, *id.* at 12–13, and impermissibly seek to have Defendant create new documents by compiling timelines and analyzing data, *id.* at 10–12. Defendant objects that certain requests mischaracterize facts, make unfounded assertions, and attempt to attribute to Defendant statements that it did not make. *Id.* at 10. Additionally, Defendant argues that Plaintiffs seek irrelevant information about negotiations leading up to the Agreement and alternatives considered by Defendant in taking certain actions. *Id.* at 9–10. Defendant further asserts that Plaintiffs exceeded the maximum number of interrogatories allowed under Rule 33(a)(1), because many of their interrogatories contain "discrete subparts" that should count as independent interrogatories. *Id.* at 5–8. Apart from the Rule 33 objection, *see* Def.'s Br. 5–9, Defendant's brief does not develop meaningful legal arguments explaining why the challenged discovery requests are "outside the scope permitted by Rule 26(b)(1)," Fed. R. Civ. P. 26(b)(2)(C)(iii). *See generally* Def.'s Br. 9–14.

A.      *Definition of "Property"*

Defendant contends that Plaintiffs' "repeated references to Property in [several of] the Discovery Requests is undefined, making it unfeasible to determine what the definition of Property is." Def.'s Br. 11[4] Relatedly, Defendant asserts that because it is only alleged to have agreed to sell Plaintiffs a portion of the Project Property—i.e., the roughly 26-acre Sale Property—information not relating to that select portion is irrelevant in this case. *Id.* at 12. Thus, Defendant contends that the requests referring to the "Property" are overbroad to the extent that

---

[4] The specific requests at issue are Interrogatory Nos. 7, 9, 10, 12, 14, and 16 of Plaintiffs' First Set of Interrogatories, ECF No. 74-2, at 9–13, and RFP Nos. 3, 9, 12, 13, 18, 21, 22, 23, 26, and 30–35 of Plaintiffs' First Set of Requests for Production of Documents, *id.* at 13, 15–22.

they seek information relating to the entire 150-acre Project Property rather than just the Sale Property.

In the instructions accompanying the requests, Plaintiff defines "Property" as "the Property that forms the basis of this lawsuit which was to be used as a multi-family development as more particularly described in the Purchase Option Agreement." ECF No. 74-2, at 4. This definition appears to limit references to "Property" to encompass the Sale Property only. Further, at the hearing on these motions, counsel for Plaintiffs made clear that these requests sought information about the Sale Property only, not about the Project Property as a whole. Thus, I find Defendant's arguments are without merit. Defendant shall respond to the discovery requests.

B.    *References to "Cathcart" in the Collective*

Similarly, Defendant objects to Plaintiffs' use of "Cathcart" to refer to both The Reserve and Robert Cathcart collectively in various requests, asserting that Defendant "cannot be expected to interpret or untangle these discovery requests." Def.'s Br. 13.[5]  Aside from its bare assertion that responding to such requests is "impossible," however, Defendant offers no explanation of why Plaintiffs' use of "Cathcart" to refer to Plaintiffs collectively imposes an undue burden on Defendant, Fed. R. Civ. P. 26(c), or is otherwise outside the scope of discovery allowed under Rule 26(b)(1).

Considering the allegations in the pleadings, Plaintiffs' requests are reasonably clear. The Second Amended Complaint details that the Agreement was initially between Cathcart and Defendant, but that in February 2020, Cathcart formed The Reserve as a special purpose entity for purposes of the Agreement. *See* Second Am. Compl. ¶ 26. A plain reading of these requests makes clear that Plaintiffs seek information related to Defendant's dealings with Cathcart and/or

_____

[5] The specific requests at issue are Interrogatory Nos. 3, 5–8, and 10–11 ECF No. 74-2, at 8–11, and RFP Nos. 3–9, 11, and 14–16, *id.* at 13–17.

The Reserve. Further, the claims in this action are asserted either by, or against, both Cathcart and The Reserve collectively, and The Reserve's sole purpose was the purchase of the Sale Property. *Id.* ¶¶ 28, 35. Thus, information related to Defendant's dealings with either Plaintiff concerning the Agreement or the Sale Property are relevant. As such, I find this objection without merit. Defendant must respond to Plaintiffs' discovery requests, treating those requests as seeking information about Plaintiffs individually and collectively.

C.    *Offsetting Litigation Costs*

Defendant further argues that many of Plaintiffs' requests are designed to "offset their litigation costs by having [Defendant] compile The Reserve and Cathcart's own communications, rather than conducting an internal search of their own records." Def.'s Br. 12.[6] The parties' communications about the subject matter of the litigation are relevant. Moreover, some of Plaintiffs' requests seek communications between Defendant and non-parties about the communications between the parties. *See* RFPs Nos. 6, 7, 14, ECF No. 74-2, at 14, 16. Defendant has not shown that the requests for communications are unduly burdensome or disproportionate to the needs of the case. *See* Fed. R. Civ. P. 26(c)(2). Furthermore, Plaintiffs explain that they are not seeking documents that they clearly already have, such as those Plaintiffs attached to any filings. Accordingly, Defendant's objections must be overruled and the requests answered. *See* Fed. R. Civ. P. 26(b)(1).

D.    *Compiling Timelines & Analyzing Data*

Next, Defendant contends that some of Plaintiffs' discovery requests improperly ask Defendant to create new documents by compiling timelines and analyzing data and information.

---

[6] The specific requests at issue are Interrogatory Nos. 3, 6, 10, and 11and RFP Nos. 3–7, and 14. *See* ECF No. 74-2, at 8–11, 13–17.

14

Def.'s Br. 10.[7] Defendant's argument is misplaced. In the interrogatories at issue, Plaintiffs ask

Defendant to describe or identify certain facts in a "timeline." Although Defendant argues that

Plaintiffs are demanding that it create documents, Plaintiffs explain that they are simply asking

Defendant to respond with a chronological description of facts. Plaintiffs' request is for a

reasonable and customary response to an interrogatory, and it does not require Defendant to

create a document, other than its written answer. Accordingly, I find that this objection is without

merit.

E.     *Mischaracterized Facts, Unfounded Assertions & Wrongfully Attributed Statements*

        Defendant additionally argues that several of Plaintiffs' requests "mischaracterize facts,

make unfounded assertions and attempt to put statements in the mouth of [Defendant]." Def.'s

Br. 10.[8] Defendant challenges the form of certain Interrogatories. For example, Interrogatories 4

and 5 both instruct that "if" Defendant makes certain assertions, Defendant should provide the

basis for those assertions. *See* ECF No. 74-2, at 8. Defendant contends that this form of question

is improper because it calls for speculation and improperly seeks to maneuver Defendant "into an

unfavorable tactical position." Def.'s Br. 10 (quoting *Aktiebolaget Vargos v. Clark*, 8 F.R.D.

635, 636 (D.D.C. 1949)). I disagree. These Interrogatories call on Defendant to identify its

position on certain issue and provide support for that position. If Defendant disagrees with

Plaintiffs' characterization of Defendant's position, Defendant may say so, providing its position

and the factual basis for it. Those requests seek information relevant to Defendant's

counterclaims. *See* Am. Countercl. ¶¶ 24–26, 28–40. This form of "contention" interrogatory is

also permissible under Rule 33. *See* Fed. R. Civ. P. 33(a)(2). "Examples of proper contention

interrogatories include asking a party to (1) state its contentions or clarify whether it is making a

---

[7] The specific requests at issue are Interrogatory Nos. 6, and 9–12.ECF No. 74-2, at 9–11.
[8] The specific requests at issue are Interrogatories Nos. 4–6 and 9–13, ECF No. 74-2, at 8–11, and RFP
Nos. 8, 10, 15, and 17–20, *id.* at 14–18.

contention, (2) articulate the facts underlying a contention, (3) assert a position or explain that position in relation to how the law applies to the facts, and (4) explain the legal or theoretical basis behind a contention." *Mtn. Valley Pipeline, LLC v. 6.5 Acres of Land Owned by Sizemore Inc. of Va.*, No. 7:18cv610, 2019 WL 8918904, at *2 (W.D. Va. Apr. 5, 2019) (citation omitted). Moreover, if Defendant does not make the cited contentions, or does not make them currently, it can simply say so in its answer. *See* Fed. R. Civ. P. 26(g)(1), 33(b)(3). Accordingly, I find Defendant's objection is without merit.

Interrogatory 6 and Request for Production 8 seek information and documents regarding Defendant's allegations that Plaintiffs breached the Agreement and were in default of the same, ECF No. 74-2, at 9, 14–15, and Request for Production 15 asks for documents relating to Defendant's contentions that Plaintiffs have not complied with the Agreement. These requests seek relevant information, *see* Am. Countercl. ¶¶ 78–90, and Defendant does not explain why these requests purportedly "mischaracterize" facts. Def.'s Br. 10. Thus, I find that Defendant's objections to these requests are likewise unfounded.

Interrogatory 9 asks about attempts by Defendant to record a subdivision plat for the Sale Property. ECF No. 74-2, at 10. Defendant contends that request mischaracterizes facts because it asserts that the parties never agreed to a subdivision plat. Def.'s Br. 7. Plaintiffs take a different view. Regardless, the interrogatory asks Defendant to identify specific actions that Defendant took "to obtain necessary approvals to record a subdivision plat of the Property as contemplated by Paragraph 11 of the Purchase Option Agreement." ECF No. 74-2, at 10. If Defendant took any of the specified actions regarding the "contemplated" subdivision plat, it must identify them in responding to Interrogatory 9. *See* Fed. R. Civ. P. 33(b)(3).

16

Interrogatories 10 and 11 and Request for Production 17 and 19, ECF No. 74-2, at 10–11, 17, all seek relevant information pertaining to Plaintiffs' claims that Defendant breached the Agreement by stockpiling dirt on the property and never removing it, by not building an asphalt trail, and by not curing alleged breaches of which it was given notice. *See* Second Am. Compl. ¶ 45(c)–(d). Interrogatory 13 and Request for Production 20 seek information and documents concerning Defendant's written assertion that Defendant had the unilateral right to terminate the Agreement, ECF No. 74-2, at 11, 18. *See* Second Am. Compl. ¶ 53 ("Despite [Plaintiffs'] good faith attempt to allow [Defendant] to address said breaches, [Defendant] responded on February 12, 2021 asserting that it could 'terminate' the agreement based on its own failure to meet its conditions with respect to the Parcel to be settled."). In the letter, Defendant asserted that if certain conditions were not satisfied by the Settlement Date, it had the option to terminate the Agreement, and it stated that the Agreement was terminated. Second Am. Compl. Ex. R, ECF No. 127-18. This information is relevant to the claims and defenses and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). As such, I find Defendant's arguments unfounded.

Interrogatory 12 and Request for Production 18 ask for information and documents regarding the impact of the discovery of wetlands on access to the Sale Property. ECF No. 74-2, at 11, 17. Both parties identify the other's actions concerning the wetlands as potential breaches of the Agreement. Second Am. Compl. ¶ 45; Am. Countercl. ¶ 90. Furthermore, Defendant does not develop its argument that either request is overly broad or vague. Def.'s Br. 12. Accordingly, Defendant shall respond to Interrogatory 12 and Request for Production 18.

F.    *Negotiations Leading to the Agreement & Alternatives Considered*

Defendant also asserts that Plaintiffs' requests seeking information on negotiations leading up to the parties' Agreement,[9] and requests seeking information on alternatives considered by Defendant,[10] are irrelevant because the issues in this case concern only the Agreement, and there is no allegation that the Agreement is ambiguous. Def.'s Br. 9–10. Whether or not the terms of the Agreement itself are ambiguous, the parties assert competing views on the location of the Sale Property on the Project Property. The parties' negotiations leading up to the Agreement and for each amendment thereto may provide relevant information about, for example, the location of the Sale Property, any alternative construction entrance and shared access, and the stockpiling of dirt, all of which are issues identified in the pleadings.

As to Plaintiffs' requests regarding alternative courses of action considered by Defendant, Plaintiffs have since abandoned this request and clarified that Defendant need not provide information on alternatives it considered. Letter of Nov. 4, 2021, at 4 ("Where there are requests for 'alternates' or 'alternatives' (whether sources of financing, arrangements, locations, or access), R 150 need not respond to those requests."). Accordingly, Interrogatories 7–10 and Requests for Production 9, 11, and 12, are modified to remove the portions of the requests seeking information on alternatives considered by Defendant.

G.    *Specific Relevancy Objections*

Throughout its briefing, Defendant asserts that many of Plaintiffs' discovery requests seek irrelevant information.[11] Specifically, Defendant contends that Interrogatory 7, which asks about the facts and circumstances that resulted in Defendant's obtaining a loan for $10 million secured by a lien on the Sale Property via a Credit Line Deed of Trust and Assignment of Leases

---

[9] The specific requests at issue are RFP Nos. 3–5, 13, and 26, ECF No. 74-2, at 13–14, 16, 19.

[10] The specific requests at issue are Interrogatory Nos. 7–10, and 12, ECF No. 74-2, at 9–11, and RFP Nos. 9, 11, and 12, *id.* at 15–16.

[11] The specific requests at issue are Interrogatories Nos. 7, 14, and 15. ECF No. 74-2, at 9, 11–12.

and Rents, ECF No. 74-2, at 9, seeks irrelevant information because Plaintiffs have already attached Defendant's Credit Line Deed of Trust and Assignment of Leases and Rents to the Amended Complaint. Def.'s Br. 6. The request, however, asks for information regarding the facts and circumstances *leading up to* Defendant's obtaining the loan, not simply the documents themselves. Moreover, because Plaintiffs assert that Defendant willfully breached the Agreement by encumbering the Sale Property via the loan, this information is relevant to Defendant's intent in obtaining the loan and encumbering the Sale Property. Accordingly, I find that Interrogatory 7 seeks relevant information.

Defendant also specifically argues that Interrogatory 14 seeks irrelevant information because it asks for information pertaining to Hunt Companies and MMA Financial Company, LLC, and those entities are not defendants here. Def.'s Br. 8. While these entities are not parties here, MMA is the sole member of R 150 SPE, LLC, *see* Am. Countercl. ¶ 4, and Defendant's representatives for purposes of the Agreement were employees of Hunt Companies, Second Am. Compl. ¶ 28. The allegations and exhibits to the pleadings show that these entities were involved at various times in the dealings between the parties. Accordingly, information about these entities' relationship with Defendant and decision making regarding the Project Property falls within the scope of discovery. *See* Fed. R. Civ. P. 26(b)(1).

Defendant argues that Interrogatory 15 seeks irrelevant information. Def.'s Br. 8. Interrogatory 15 asks about an agreement Defendant had with Trex Company regarding the development of an office building for Trex Company, why and when that agreement was terminated, which party terminated the agreement, what proffers or representations made to Frederick County were affected by that termination, what relationship Defendant had to Glaize Developments, Inc., and what role Defendant's counsel, Thomas Lawson, Esq., played in the

contract formation and termination as a member of the Board of Directors of Trex Company. None of the allegations of the Second Amended Complaint or Amended Counterclaim pertain to either of these entities, and Plaintiffs do not allege that Defendant breached the Agreement by entering into an agreement with Trex Company. Accordingly, I find that this request seeks information irrelevant to the claims and defenses in this action. Accordingly, Interrogatory 15 is hereby STRICKEN in its entirety. Request for Production 24 is STRICKEN in its entirety for the same reasons.

### H.    Interrogatory Subparts

Defendant also argues that several of Plaintiffs' interrogatories contain "discrete subparts" and exceed the number of interrogatories allowed under Rule 33(a)(1). .[12] "Unless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. P. 33(a)(1). The Fourth Circuit has not answered the question as to what constitutes a "discrete subpart." *See Ruchman & Assocs., Inc. v. Sev1Tech, LLC*, No. 1:20cv11, 2020 WL 6930518, at *1 (E.D. Va. Oct. 20, 2020). At least one judge of this Court has recognized, however, that two "divergent views" have arisen as to what constitutes a "discrete subpart." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, No. 1:00cv113, 2002 WL 534459, at *2 (W.D. Va. Mar. 18, 2002) (Jones, J.). Under one view, "all subparts should count as separate questions toward the interrogatory limit." *Id.* (citing *Valdez v. Ford Motor Co.*, 134 F.R.D. 296, 298 (D. Nev. 1991)). The second, more liberal, view holds that a subpart is not discrete when it is "logically or factually subsumed within and necessarily related to the primary question." *Id.* (quoting *Kendall v. GES Exposition Servs.*, 175 F.R.D. 684, 685 (D. Nev. 1997)).

---

[12] The specific requests at issue are Interrogatories 7–12 and 14–15. ECF No. 74-2, at 9–12.

Defendant argues that Plaintiffs' interrogatories contain unrelated subparts even when judged under the more liberal standard. Def.'s Br. 5–6. I agree. In Interrogatory 7, for instance, the primary question relates to the "facts and circumstances" resulting in Defendant obtaining a loan. Most of the subparts seek information logically stemming from this primary question (i.e., the purpose of the loan, alternate sources of financing, disclosures made to the lender, whether the lender would have made an unsecured loan or accepted alternative collateral, if the loan was guaranteed). The Interrogatory also asks why Defendant did not seek Plaintiffs' consent before taking out the loan. This strays too far from inquiring as to the facts and circumstances resulting in Defendant's loan and is more concerned with why certain facts and circumstances did not occur. Accordingly, Interrogatory 7 is counted as two interrogatories. For the same reason, Interrogatory 8 also contains an unrelated subpart. Thus, Interrogatory 8 is counted as two interrogatories.

Interrogatory 9 asks for information about "any and all attempts" by Defendant to record a subdivision plat of the Sale Property. It extends too far, however, by asking about alternative proposals considered by Defendant, irrespective of whether those proposals resulted in an attempt to obtain approval. Plaintiff has agreed to withdraw that subpart, and the remaining subparts in Interrogatory 9 are logically related to the primary question.

Interrogatory 10 asks about "all facts and circumstances" that led to Defendant's stockpiling of dirt on the Sale Property, but it also seeks information pertaining to Defendant's alleged failure to remove the dirt, which is not subsumed by the primary question about stockpiling it in the first place. The three subparts concerning removal of the dirt are logically related and count as one additional interrogatory.

Interrogatory 11 asks why Defendant failed to design or construct the asphalt trail on the Sale Property as required by the Agreement, and all the remaining portions of Interrogatory 11 logically relate to that primary question. The subpart in Interrogatory 12 all logically relate to the primary question of "why R150 asserts that wetland make an alternative legal access to the Property unfeasible." Thus, I find that Interrogatories 11 and 12 do not contain any unrelated subparts.

Interrogatory 14 asks about the relationship between Defendant and its former or current member entities, Hunt Companies and MMA, respectively. The subparts concerning ownership, acquisition of MMA, and decision-making of the entities seek information subsumed by the primary question. The subpart asking about "changes made to Hunt and R150's strategic plan for the development of the Property" is unrelated and counts as a separate interrogatory.

Plaintiff issued a total of seventeen interrogatories, one of which I struck (Interrogatory 15), and four of which each contained one unrelated subpart. Accordingly, Plaintiff's First Set of Interrogatories contained twenty interrogatories, which is within Rule 33's twenty-five interrogatory limit.

I.    *General Objections*

Defendant also raises several general challenges to many of Plaintiffs' discovery requests. *See* Def.'s Br. 4–5, 9. The burden of demonstrating specifically how each discovery request is improper, however, lies squarely with the part resisting discovery. *See Eramo*, 314 F.R.D. at 209. Moreover, "[g]eneral objection are not useful to the court in ruling on a discovery motion, and a bare objection does not meet the standard for a successful objection." *Brown v. Experian Info. Sols., Inc.*, No. 3:16cv670, 2017 WL 11632852, at *1 (E.D. Va. Apr. 17, 2017). As such, I find that Defendant has failed to meet its burden as to these general objections.

IV. Conclusion & Order

For the foregoing reasons, Defendant's Motion for a Protective Order, ECF No. 64, is hereby **GRANTED** in part and **DENIED** in part, and Plaintiffs' Motion to Compel, ECF No. 69, is hereby **GRANTED** in part and **DENIED** in part as follows:

1.    Four interrogatories are added to Plaintiffs' First Set of Interrogatories, bringing the total number of interrogatories to twenty.

2.    Interrogatories 7–10 and Requests for Production 9, 11, and 12, are modified to remove the portions of the requests seeking information on alternatives considered by Defendant.

3.    Interrogatory 15 of Plaintiffs' First Set of Interrogatories, ECF No. 74-2, at 12, and Request for Production 24 of Plaintiffs' First Set of Requests for Production of Documents, ECF No. 74-2, at 19, are hereby **STRICKEN** in their entirety because they seek irrelevant information. *See* Fed. R. Civ. P. 26(b)(1).

4.    Defendants are hereby **ORDERED** to respond to Interrogatories 1–14, and 16–17 of Plaintiffs' First Set of Interrogatories, ECF No. 74-2, at 8–12, and Requests for Production 1—23, and 25–35 of Plaintiffs' First Set of Requests for Production, within twenty-one (21) days from the date of this Order.

5.    All other requested relief is **DENIED**.

It is **SO ORDERED**.

The clerk is directed to deliver a copy of this Memorandum Opinion & Order to the parties.

ENTERED: September 28, 2022

23

Joel C. Hoppe
United States Magistrate Judge